**KENTUCKY & WEST VIRGINIA COAL & MINING CO. v. BLUE DIAMOND COAL CO.**

No. 591.

United States District Court
E. D. Kentucky, London.

July 31, 1952.

Henry T. Duncan, Jr., Allen, Duncan, Duncan & Arnold, Lexington, Ky., for plaintiff.

Logan E. Patterson, James S. Wilson, Pineville, Ky., James Sampson, Harlan, Ky., for defendant.

FORD, Chief Judge.

Pursuant to sections 2201 and 2202 of Title 28 U.S.C. both parties to this litigation seek a judicial declaration determining disputed questions of law and fact arising from a controversy between them in respect to the right claimed by the defendant to terminate its coal mining operations upon and remove its mining equipment from plaintiff's lands described in a certain mining lease entered into by the parties in 1940.

The parties waived trial by jury. The case was tried to the Court and is submitted for judgment. In conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. the Court finds the facts specially and states separately its conclusions of law thereon as follows:

Findings of Fact.

1. There is an actual controversy between the parties. The matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and the action is between citizens of different states.

2. The plaintiff is the owner of a large acreage of coal-bearing lands located on tributary waters of the Cumberland River in Eastern Kentucky including the land involved in this litigation which is underlaid with a seam of coal known as "the Harlan seam".

The executive officers and operating employees of the defendant are experienced operators of coal mines in the Harlan field of Eastern Kentucky. For many years they have been engaged in extensive coal mining operations and are thoroughly familiar with the mining difficulties usually encountered in that coal field. By experience, they are qualified to determine the best means and methods to employ for profitable operations.

To distinguish it from defendant's other mining enterprises, the operation involved in this controversy is usually referred to as the "Pathfork" mine.

3. By contract of October 8, 1940, the plaintiff, in consideration of certain rents and royalties therein stipulated and certain convenants and agreements therein set out, granted to the defendant the exclusive right and privilege to mine and remove and defendant agreed to mine and remove, in a manner consistent with careful and prudent mining, all of the "mineable and merchantable" coal contained in the Harlan seam lying in and under a specifically described tract of land located on the waters of Pathfork and Mill Creek, waters of Puckett's Creek of the Cumberland River in Harlan County, Ky., containing 889 acres, more or less.

According to the contract, the term of the lease was "for and during the time or term of years necessary to mine, excavate and remove all of the said 'mineable and merchantable' coal herein leased * * *." The contract precisely defines the meaning of the words "mineable and merchantable coal", as used therein, thus:

"By term 'mineable and merchantable' coal, as used in this lease, is meant coal which when reached in the prosecution of lessee's operations hereunder, could be mined at reasonable profit by the use of machinery and methods which at the time are modern and efficient. *It is understood and agreed between the parties hereto that said term 'mineable and merchantable' coal, as employed in this lease, shall be given reasonable and practicable construction to the end that as much coal shall be recovered as reasonable and practicable, but without imposing any unreasonable burden upon the lessee in this regard where natural faults or bad roof, or other natural conditions* that are unfavorable are encountered." (Emphasis supplied).

Provision is made in the contract for the defendant to surrender the leased premises and remove its equipment therefrom at the termination of the lease. The plaintiff is given a lien upon all improvements and personal property placed by the lessee on the leased premises to secure performance of defendant's obligations under the contract.

Provision is also made for the termination and settlement by arbitration of any differences or disputes arising between the parties, but on the day the trial was begun and before the beginning of the hearing of testimony, it was stated by counsel for both parties that neither of them wished to avail themselves of the provisions of the contract relative to arbitration of the controversies or disputes here involved.

4. The defendant expended approximately $800,000 in erecting and providing its plant and equipment for the operation of the mining enterprise contemplated by the agreement. The mine was put on an operating basis on April 1, 1946, and the operation was continued until it was closed on August 31, 1951. The defendant's accounting records show that the operation of the mine during the first fiscal year ending March 31, 1947, resulted in a loss of $117,104.81. The next fiscal year ending March 31, 1948, resulted in an operating loss of $112,037.77. The operating losses sustained during each of the following years were as follows:

The year ending March 31, 1949 $54,451.03
The year ending March 31, 1950 118,916.58
The year ending March 31, 1951 37,001.48

During the period April 1, 1951 to closing of the mine on August 31, 1951 the loss was $58,601.03. The total operating loss sustained by defendant in operation of this "Pathfork" mine was the sum of $488,112.-07, not including $25,168.93 paid to cover minimum royalties for the years before the mine was put in operation. In commenting upon these heavy losses, Mr. Gordon Bonnyman, defendant's Assistant General Manager, said: "One of the most discouraging features about it was that it lost money during the period of the best market for coal that has existed since 1920, those being the years 1947 and 1948."

5. The preponderance of the testimony convincingly establishes the following facts:

Soon after entering upon the operation of the mine, it was found that the top was so soft and shaley that it would not hold up even by the use of extensive heavy timbering. These bad roof conditions became worse as the operation progressed. The result was a heavy added expense in providing labor to remove large quantities of debris from the entries and airways of the mine, and to remove an extra amount of particles of slate and rock from the coal in order to render it marketable. The bad roof became an increasing danger to the lives of employees working in the mine.

Moreover, an unusual amount of hard substances called "sulphur balls" were found in the coal seam which not only interrupted the cutting of the coal but injured the cutting machinery to such an extent that the efficiency of the operation was seriously impaired and the cost substantially increased.

For more than five years, by the use of machinery and methods which, under the prevailing natural conditions, reasonably fulfilled the contractual requirement of modernity and efficiency, and the employment of capable and efficient mine operators, the defendant exercised the utmost

good faith in its effort to develop and profitably operate the mine, but it seems clear that, due to the bad roof and other natural faults and unfavorable conditions, profitable operation thereof was and is not reasonably possible.

The plaintiff's contention that defendant failed to use modern and efficient machinery in the operation of the mine and thereby brought about the failure to realize reasonable profits, is untenable.

In view of the natural faults encountered in this mine, to require the defendant to make large additional expenditures in further doubtful experimentation by the use of costly mechanical equipment, novel devices and uncertain mining methods recommended by plaintiff's experts, would seem to impose an unreasonable burden upon the defendant, not contemplated by the contract.

■ According to the agreed meaning of the term "mineable and merchantable coal", as used in the contract, at the time defendant discontinued operations of the mine on August 31, 1951, there was no "mineable and merchantable" coal in the Harlan seam underlying the lands described in the contract.

6. On September 1, 1951, the defendant gave notice to the plaintiff that there was no mineable or merchantable coal in the Harlan seam underlying the leased premises and that by reason thereof the defendant regarded the contract as terminated. The communication also informed the plaintiff that defendant would commence the removal of its machinery, steel structures and personal property from the leased premises 45 days after the date of the notice unless the plaintiff elected to purchase the same. Plaintiff did not exercise the option to purchase.

7. The plaintiff makes no claim that as of September 1, 1951, the defendant was indebted to it on account of unpaid royalties or otherwise.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter. 28 U.S.C. §§ 1332, 2201, 2202.

■ 2. The parties waived the provisions of the contract relating to determination of their controversies or disputes by arbitration. Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 7 Cir., 128 F.2d 411; American Locomotive Co. v. Gyro Process Co., 6 Cir., 185 F.2d 316.

■ 3. It being established by a preponderance of the evidence that as of September 1, 1951, there was no "mineable and merchantable coal" underlying the leased premises, the defendant was lawfully entitled to treat and declare the lease terminated and to remove its property from the leased premises, as provided in the contract, free from any lien imposed thereunder.

4. Judgment should be entered declaring the rights of the parties as hereinabove set out.