Gerald S. WIGGINS and Larue G. Wiggins, Plaintiffs-Appellees, Cross-Appellants,

v.

WARRIOR RIVER COAL COMPANY, a corporation, Defendant-Appellant, Cross-Appellee.

No. 82–7021.

United States Court of Appeals, Eleventh Circuit.

Feb. 4, 1983.

Zeanah, Donald & Hust, Herschel T. Hamner, Jr., Tuscaloosa, Ala., for defendant-appellant, cross-appellee.

Gordon Rosen, Rosen, Wright, Harwood, Albright & Cook, David L. Carroll, Tuscaloosa, Ala., for plaintiffs-appellees, cross-appellants.

Before GODBOLD, Chief Judge, FAY and SMITH *, Circuit Judges.

FAY, Circuit Judge:

Plaintiffs-appellees, Gerald S. Wiggins and LaRue G. Wiggins ("Wiggins"), brought this diversity action against defendant-appellant Warrior River Coal Company ("Warrior") seeking $125,000.00 in damages, which amount represented the remaining minimum advance royalties allegedly due under a coal mining lease executed by the parties on October 24, 1977. The Wiggins moved for summary judgment. The trial court issued an order and memorandum opinion, dated October 13, 1981, granting Wiggins' motion for summary judgment and awarding them damages in the amount of $125,000.00.[1] Warrior appealed. Finding that the district court did not err in its grant of Wiggins' motion for summary judgment, we affirm.

## I.

The uncontroverted facts of this case establish that on October 24, 1977, the Wiggins entered into a coal mining lease with Warrier under the terms of which Warrior was granted the right to mine coal on property owned by the Wiggins. The lease contained a provision for the payment of minimum total royalties to the Wiggins in the amount of $200,000.00. The lease provided for the payment of this amount in annual installments of $25,000.00, payable on October 24, 1977 and each subsequent year until paid. Warrior made royalty payments of $75,000.00 to the Wiggins under the lease, paid as follows: $25,000.00 upon execution of the lease in 1977, $25,000.00 in 1978, and $25,000.00 in 1979.

On September 12, 1980, Warrior notified the Wiggins that it was surrendering and terminating the lease because it was unable to obtain the necessary permits under federal and state mining regulations, which rendered the coal on the leased premises commercially unmineable. The notice further indicated Warrior's intent to discontinue royalty payments.

On December 1, 1980, the Wiggins filed a summons and complaint in the Circuit Court of Tuscaloosa County, Alabama, claiming anticipatory breach and seeking damages in the amount of $125,000.00, which represented the remaining minimum advance royalties allegedly due under the lease. Along with its complaint, the Wiggins filed a motion for summary judgment. On December 12, 1980, the state court entered an order transferring the case to the United States District Court for the Southern District of Alabama, Western Division. An order and memorandum opinion were entered by the trial court on October 13, 1981, granting summary judgment in favor of the Wiggins in the amount of $125,000.00. The summary judgment order was later amended to provide for payment of the judgment amount in installment payments of $25,000.00 per year.

This appeal followed.

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The summary judgment was later amended by the trial court in its order of November 17, 1981. The judgment was amended to provide for the payment of the judgment amount in installments of $25,000.00 per year. The amendment also provided for interest to be paid on the principal.

## II.

On appeal, Warrior contends that the trial judge erred in granting Wiggins motion for summary judgment because the terms of the contract are so ambiguous with respect to minimum advance royalty payments that reasonable minds may differ; therefore, a question of fact exists for the jury. Generally, the interpretation of a contract is an issue of fact for the jury. *General Wholesale Beer Company v. Theodore Hamm Company,* 567 F.2d 311 (5th Cir.1978); *see Zell Ins. Agency v. Guaranty Security Ins. Co.,* 399 F.2d 147 (5th Cir. 1968). "If the terms of the contract are unambiguous, however, then the interpretation of the terms is solely for the Judge. *Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1234 (5th Cir.1973). Merely because the parties disagree upon the meanings of contract terms will not transform the issue of law into an issue of fact." *General Wholesale Beer,* at 313 *citing Barclays Bank,* at 1234.[2]

■ Thus framed, the issue is whether the contract terms governing minimum advance royalties are ambiguous therefore necessitating a jury determination. The trial court found that the lease agreement was clear and certain in regard to Warrior being obligated to pay the Wiggins a minimum total royalty of $200,000.00. The record amply supports the trial judge's finding, and we concur with its conclusion that the lease agreement as a whole was unambiguous and that the Wiggins, under the terms of the lease, were entitled to minimum total royalties of $200,000.00. A review of the language of the lease agreement supports the trial courts decision.

The "minimum advance royalty" provision of the lease agreement states:

*Minimum Advance Royalties.* Warrior River shall pay to Lessor a minimum advance royalty of $25,000.00 upon execution from the date hereof and continuing each year thereafter on the anniversary date while this Lease is in effect. Warrior River shall pay the Lessor a minimum annual advance royalty of $25,000.00. *Minimum total royalties, production and/or annual royalties shall be $200,000.00.* All minimum advance royalty payments may be credited by Warrior River against future production royalties payable to Lessor under Subsection 5(b). *If Warrior River should terminate and surrender this Lease as provided in paragraph 15 of this Lease Agreement, at any time before the total royalty of $200,000.00 has accrued, it will pay to Lessor the unaccrued balance of said $200,000.00 in minimum annual payments of $25,000.00 or the balance, whichever is less.* (Emphasis supplied)

The applicable provision on surrender states:

15. Surrender by Warrior River. Notwithstanding any provision herein to the contrary, and after Warrior River has mined and removed all minable and marketable coal from the Leased Premises and has performed all its other obligations under this Lease, Warrior River may upon Ninety (90) days' written notice to Lessor surrender and terminate this Lease as to all of the Leased Premises. Upon a surrender and termination of this Lease as to all to the Leased Premises, Warrior River shall be under no further obligation of any kind or nature to the Lessor except for the making of payments that have accrued at the date of such surrender and termination, the payment of taxes accrued while the Lease

---

**2.** This basic rule of contract construction has been followed and applied in Alabama. In *Alpine Const. Co. v. Waterworks Bd., etc.,* 377 So.2d 954, 956 (Ala.1979), the Alabama Supreme Court stated:

There is scarcely a rule more firmly established than that the court not the jury, will interpret the meaning of a contract, whether oral or written unless the court determines the contract to be ambiguous and one of the

parties makes an offer of proof as to surrounding facts and circumstances which would clarify the contract's meaning, in which case it is within the province of the jury to ascertain those facts and draw such inferences from them as are necessary to the interpretation of the contract upon proper instructions by the court. *Foster & Creighton Co. v. Box,* 259 Ala. 474, 66 So.2d 746 (1953), and cases cited therein.

was in effect, and the satisfaction of all federal and state environmental and mining laws and regulations applicable to the Leased Premises which have occurred prior to the date of such surrender or termination.

■ After reviewing the above provisions and the other provisions of the lease, we hold that the language of the lease is clear and certain regarding Warrior's obligation to pay the Wiggins a minimum total royalty of $200,000. This obligation "accrued" upon the termination of the lease. The lease is also clear and certain in regard to the continuance of that obligation after surrender and termination. In so holding, we adopt the following reasoning of the district court judge:

The agreement uses the word 'minimum' in several instances with reference to royalties. This means 'at least' in common parlance and reflects an intention to pay at least these amounts.

Moreover, the lease expressly provides that '[i]f Warrior River should terminate and surrender this Lease as provided in paragraph 15 of this Lease Arrangement, at any time before the total royalty of $200,000 has accrued, it will pay to Lessor the unaccrued balance of said $200,000 in minimum annual payments of $25,000 or the balance, whichever is less.' Because the lease expressly covers the contingency in issue, the defendant may not avoid its promise. Impossibility does not excuse nonperformance where the promisor has indicated an intent to assume the risk thereof. *City of Albertville v. United States Fidelity & Guaranty Co.,* 272 F.2d 594, 509–601 (5th Cir.1959) (applying Alabama law).

This is not changed by the apparent incongruity between clauses 5(a) and 15. Clause 5(a) specifically assures the lessor plaintiff of a minimum total royalty of $200,000 (at least $25,000 annually) even if defendant should terminate and surrender the lease under Clause 15. Clause 15 states generally that notwithstanding any provision herein to the contrary, the lessee upon termination and surrender

will only be responsible for payments that have accrued at the date of such surrender. There is no conflict between the clauses.

'[I]f there exists inconsistency between two clauses of a contract that cannot be reconciled, the inconsistency must be resolved in favor of a prior clause, unless an intention to thereafter qualify is plainly expressed.' *City of Fairhope v. Town of Daphne,* 282 Ala. 51, 58, 208 So.2d 917, 924 (Ala.1968) (citations omitted). No such intention is plainly expressed. This clear intent of the contract is bolstered by Clause 13 of the lease, which provides that '[i]f Warrior River is unable to perform any of the terms or covenants of the Lease by reason of damage or delay resulting from disaster, labor disturbances, strikes, lockouts or Acts of God, ...' Warrior River will not be excused 'from paying minimum advance royalties and production royalties to Lessor.' While this clause does not cover the contingency in issue it is a good indication that Warrior River intended the Lessor to receive the minimum total royalties even if performance by defendant was rendered impracticable or impossible.

Accordingly, the court is of the opinion that plaintiffs are entitled to summary judgment for the unpaid minimum royalties in the amount of $125,000.

Oct. 13, 1981 Order of the District Court, at 3–5.

AFFIRMED.

GODBOLD, Chief Judge, dissenting:

This is a classic case of an ambiguous contract, the obligations under which could not be decided by summary judgment.

Paragraph 5(b) of the contract provides for production royalties on coal mined of $2.00 per ton or ten percent of gross sales price per ton at the mine, whichever is higher. Production royalties must be accounted for and paid each month for the preceding month.

Paragraph 5(a), quoted in the majority opinion, provides for minimum advance royalties as follows:

—A minimum "advance royalty" of $25,-000.00, payable each year in advance "while this Lease is in effect."

—"Minimum total royalties, production and/or minimum annual royalties shall be $200,000.00."

—Minimum advance royalty payments may be credited against future production royalties payable under 5(b).

—"If Warrior River should terminate and surrender this Lease as provided in paragraph 15 of this Lease Agreement, at any time before the total royalty of $200,000.00 has accrued, it will pay to Lessor the unaccrued balance of said $200,000.00 in minimum annual payments of $25,000.00 or the balance, whichever is less."

Paragraph 19 obligates Warrior to mine and remove "all minable and marketable coal" that can be recovered by surface mining, and it defines "minable and marketable":

19. Warrior River agrees to mine and remove from the Leased Premises all minable and marketable coal recoverable by the surface mining method during the term of this Lease. Coal that is minable and marketable within the meaning of this Lease means coal that can be mined from the Leased Premises and sold by Warrior River at prevailing market prices at a profit comparable to profit made by Warrior River on sale of other coal mined and sold under this Lease.

Paragraph 15 covers the right of Warrior to surrender and terminate the lease when it "has mined and removed all minable and marketable coal."

15. *Surrender by Warrior River.* Notwithstanding any provision herein to the contrary, and after Warrior River has mined and removed all minable and marketable coal from the Leased Premises and has performed all its other obligations under this Lease, Warrior River may upon Ninety (90) days' written notice to Lessor surrender and terminate this Lease as to all of the Leased Premises. *Upon a surrender and termination of this Lease as to all of the Leased Premises, Warrior River shall be under no fur-*

*ther obligation of any kind or nature to the Lessor except for the making of payments that have accrued at the date of such surrender and termination, the payment of taxes accrued while the Lease was in effect, and the satisfaction of all federal and state environmental and mining laws and regulations applicable to the Leased Premises which have occurred prior to the date of such surrender or termination.*

Under these provisions "notwithstanding any provision herein to the contrary," after Warrior has mined and removed the minable and marketable coal, it can surrender and terminate the lease. When it does so it "shall be under no further obligation of any kind or nature to the Lessor except for the making of payments that have accrued at the date of such surrender and termination."

Warrior contends that there was no more "minable and marketable coal" as defined under paragraph 19, because the cost of making changes and improvements in the property necessary to secure state and federal surface mining permits made it impossible to mine and sell the coal at a profit. Therefore, Warrior attempted to terminate and surrender under paragraph 15. Whether Warrior is correct in its contention that there is no "minable and marketable coal," and whether it gave the proper notice to surrender and terminate, are issues to be determined by a factfinder at a trial. Assuming these issues were decided in Warrior's favor, what then would happen?

—Paragraph 15 says Warrior will pay *nothing* except to make payments that already have "accrued."

—Yet, arguably, the termination and surrender portion of paragraph 5(a) says that Warrior will pay whatever part of the $200,000 minimum that remains unpaid.

There is a head-on conflict in terms between paragraphs 5 and 15—as applied here, zero dollars versus $125,000.00—unless the conflict is dissipated by construing the word "accrued" in paragraph 15 to include the unpaid portion of $200,000.00 that is

described in paragraph 5(a). That is what the district court appeared to do (although it is not entirely clear)—i.e., it considered that the part of $200,000.00 yet unpaid was nevertheless "accrued" at the date of the surrender and termination and was, therefore, included within the statement of items in paragraph 15 that Warrior would owe upon termination and surrender. But paragraph 5 refers to any part of $200,000.00 unpaid at the time of surrender and termination as "the *unaccrued* balance." How does the unpaid balance that is described in paragraph 5 as "unaccrued" (and in the everyday language of lawyers and commerce is "unaccrued") become "accrued"? Paragraph 5(a) contains no language that brings about this conversion.

Warrior and the lessors could have made either of two different trades, and either was reasonable and commercially familiar. Warrior could be obligated to pay $2.00 per ton production royalty, and in any and all events $200,000.00, regardless of the quantity of minable coal on the land. This is what paragraph 5(a) seems to say.[1] Or Warrior could be obligated to pay production royalties of $2.00 per ton and minimum annual advance royalties of $25,000.00, so long as there was minable coal, and when the minable coal ran out Warrior could terminate and surrender and its obligations to pay production royalty and minimum royalty would then cease. The document before us does not tell us what the trade actually was. The district court recognized that the lease was "apparently incongruent" and "inconsistent," yet it cryptically found that there was no conflict between paragraphs 5(a) and 15 (and in doing so, made no mention of paragraph 20). It is implied in the district court's conclusion that it considered that the act of termination and surrender by Warrior under paragraph 15 caused the theretofore unaccrued minimum royalties under paragraph 5(a) to accrue instanter. This is not an unreasonable Olympian view of what parties to a coal mining lease might intend. But it is no less reasonable that parties might intend precisely the opposite, that is, the lessee's obligation to pay royalties (production and minimum) ran out when the minable coal ran out. The lease itself does not give us the answer to the puzzle of what the trade was. The district court found an answer not from the lease but from assuming that the trade was the first of the two possibilities I have described.

The district court's approach runs afoul of another provision. Paragraph 15 begins with the language "notwithstanding any provision herein to the contrary...." Thus, arguably "accrued" as used in paragraph 15 is to be taken in its common everyday usage, which would hardly include future annual royalty payments for the next five years. Despite the "notwithstanding" language, the district court turned to paragraph 5(a) to find a contrary meaning.

The district court attempted to bolster its conclusion by referring to paragraph 13, which imposes an obligation to pay minimum advance and production royalties even if Warrior were unable to perform by reason of labor disturbance, Acts of God, etcetera. These contingencies simply have no relation to what the parties intended the obligations between them would be if minable coal ran out and Warrior elected to terminate the lease.

Warrior was entitled to a trial and to application of the usual standards governing ambiguous contracts.

---

1. Actually paragraph 5(a) is internally inconsistent. Initially paragraph 5(a) says that minimum advance royalty payments are to be due "while this Lease is in effect." Later 5(a) says that the annual payment of $25,000.00 shall continue after termination and surrender of the lease.