Joseph ORLANDI, Deborah A. Orlandi, Karen O. Paterno, Michael E. Orlandi, and Joseph O. Orlandi, Appellants,

v.

Mont E. GOODELL, Trustee; Mont E. Goodell, personally; Nicholas Bachynsky, personally; and C.M. Krauthamer, personally, Appellees,

v.

P.J. COAL COMPANY, a Colorado Corporation; Appalachian Energy and Coal Corporation, a Nevada Corporation; and United Financial Operations, a Colorado Corporation, Third Party Defendants.

Joseph ORLANDI, Deborah A. Orlandi, Karen O. Paterno, Michael E. Orlandi, and Joseph O. Orlandi, Appellees,

v.

Mont E. GOODELL, Trustee; Mont E. Goodell, personally; Nicholas Bachynsky, personally; and C.M. Krauthamer, personally, Appellants,

v.

P.J. COAL COMPANY, a Colorado Corporation; Appalachian Energy and Coal Corporation, a Nevada Corporation; and United Financial Operations, a Colorado Corporation, Third Party Defendants.

Nos. 83–1803(L), 83–1804.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1985.

Decided April 17, 1985.

Rehearing and Rehearing En Banc Denied June 19, 1985.

---

Paul N. Bowles, Charleston, W.Va. (P. Nathan Bowles, Jr., Thomas A. Heywood, Bowles, McDavid, Graff & Love, Charleston, W.Va., on brief), for appellants.

John E. Lutz, Charleston, W.Va. (J.W. Riccardi, Payne, Loeb & Ray, Charleston, W.Va., on brief), for appellees.

Before SPROUSE, WILKINSON and SNEEDEN, Circuit Judges.

WILKINSON, Circuit Judge:

Lessees, finding no marketable coal on mining property, sought rescission of an agreement that required them to make minimum annual royalty payments and permitted them to cancel the contract by written notice to the lessor. The trial court rescinded the contract upon a jury verdict for lessees on the grounds of mutual mistake of fact with respect to the presence of marketable coal on the property. Because under West Virginia law the lease constituted a contract of hazard which allocated all business risks to lessees until proper exercise of their cancellation rights, we reverse.

Appellants Joseph Orlandi *et. al.* leased approximately 3,000 acres of Kanawha County, West Virginia, property to appellees Mont E. Goodell, *et. al.* ("Goodell") for "the right to mine and remove coal" for an initial term of twenty years under written instrument executed August 21, 1978. Under the lease, Goodell paid an advance minimum royalty of $80,000 and agreed to make additional minimum royalty payments as follows: $100,000 for the second year; $150,000 for the third year; $200,000 for the fourth year; and 7½% of the then current market price of 200,000 tons of coal for the fifth and each succeeding year [$450,000 in August 1982]. In addition, Goodell agreed to pay all ad valorem taxes on the property.

Paragraph (6) of the lease contained the following clause:

> If prior to the expiration of the initial term or any extension of the Lease, Lessee shall have mined and removed all of the merchantable and mineable coal that can be mined and removed by appropriate modern mining methods, then Lessee shall have the right to surrender this Lease upon delivering to Lessors written notice of such fact at least four full calendar months in advance of the surrender date specified in such notice ...

"Merchantable and mineable" coal was defined in paragraph (1) as "coal which, when reached in the course of Lessee's mining operations can be mined, prepared and sold at a reasonable profit by diligent, safe and skillful management and by the use of machinery and methods, which at the time are appropriate, safe and efficient."

Prior to the signing of the lease, the Orlandis made available to Goodell six core drilling samples and two written engineers'

reports concerning potential coal reserves on the property. After signing the lease, Goodell employed a contract miner who in May 1979 exposed a seam of coal at the permit site and concluded that it contained too much rock to be profitably mined. The contract miner left the premises, and appellees made no further attempts to exploit their rights under the lease. Although they telephoned Joseph Orlandi to report their negative findings, they did not surrender the lease or give notice of rejection pursuant to paragraph (6).

When Goodell failed to make the $100,000 minimum royalty payment due in August 1979, or to pay the ad valorem taxes, the Orlandis brought suit in West Virginia state court. Goodell removed the action to federal district court on diversity of citizenship, asserted several affirmative defenses, requested rescission, and counterclaimed for the initial $80,000 payment. The Orlandis moved for summary judgment, arguing that the lease unconditionally obligated Goodell to pay the annual minimum royalties. Goodell countered that the contract had been signed under a mutual mistake of fact as to the presence of merchantable and mineable coal on the property. As no such coal was available, he contended, the contract should be rescinded.

The district court denied the motion for summary judgment, stating that there was a genuine issue of fact as to whether merchantable and mineable coal existed on the property. The case proceeded to trial on Goodell's theory that the lease agreement was flawed by the mutual mistake at its foundation. The jury returned a verdict for Goodell on the question of mutual mistake and on his $80,000 counterclaim, but the trial judge set aside the latter judgment on the equitable grounds that plaintiffs had been denied the use of their land for five years.

The Orlandis brought this appeal; defendants cross-appealed on their counterclaim. We hold that the trial court erred in denying appellants' motion for summary judgment, and that the contract remained in effect until the date of judgment below.[1]

I

The doctrine of mutual mistake of fact may not, as a matter of law, void this contract. That doctrine provides that "a contract is reformable or voidable if it can be shown that the parties mutually erred about a basic fact that is material to their agreement." *McGinnis v. Cayton*, W.Va., 312 S.E.2d 765, 769 (1984).[2] The doctrine was not applicable at common law when a lessee bound himself to pay minimum royalties, thereby assuming the business risk involved in the venture. *Moxham v. Sherwood Co. of West Virginia*, 267 F. 781 (4th Cir.1920) (lessee who bound himself to pay minimum royalties "knowingly engaged in a contract of hazard," 267 F.2d 781, 784, and therefore would not be allowed to assert the defense of mutual mistake of fact); *see also Lehigh Zinc & Iron Co. v. Bamford*, 150 U.S. 665, 14 S.Ct. 219, 37 L.Ed. 1215 (1893). Under West Virginia law, which controls here, the lease at issue is a contract of hazard. The policies behind that law are firmly rooted in business realities. To apply the doctrine of mutual mistake of fact here would be to undercut the process of risk allocation that can constitute the essence of contract negotiations.

Minimum royalty leases frequently involve two groups of businessmen, neither of whom is naive or unsophisticated. Les-

---

1. We deem the date of judgment below the appropriate date for termination of liability because a final judgment of invalidity constitutes fair notice to the parties that they can no longer assume the contract to remain in force. It would be inequitable to require notice of termination pursuant to a cancellation clause after the point when judgment was entered finding the contract to be null and void.

2. Appellees misread Fed.R.Civ.P. 51 in contending that appellants may not challenge the defense of mutual mistake of fact because they failed to object when instructions went to the jury. Appellants argued in their memorandum supporting their motion for summary judgment that the lease here imposed upon lessees an absolute obligation to pay as a matter of law. It is the denial of that motion for summary judgment that we reverse today.

sors give up potential profits in their land in exchange for guaranteed minimum royalties. Lessees hope for profits far in excess of their minimum payments. Whether they will ever mine that much coal is, of course, the question. Those who contract are not clairvoyant. Commercial marriage, like all other, is laden with uncertainty.

Minimum royalty provisions are the very earmarks of contracts of hazard. In the leading West Virginia case of *Babcock Coal & Coke Co. v. Brackens Creek Coal Land Co.*, 128 W.Va. 676, 37 S.E.2d 519 (1946), the Supreme Court of Appeals of West Virginia distinguished between contracts "(1) ... requiring payment of minimum royalty regardless of the amount of minerals mined and (2) those requiring that a stipulated amount of minerals shall be mined." 37 S.E.2d 519, 522. The court held that "If the stipulation is of the first class a lessee is liable for the payment of minimum royalty although no minerals are or could be mined," whereas in the second instance, there would be no obligation to pay if no minerals existed. *Id.* at 522.[3] The court rejected the argument of mutual mistake of fact with respect to the amount of coal on the leasehold, characterized the lease as one "of hazard," and stated that the lessee "assumed the risk of the existence of coal to be mined from ... [lessor's] land sufficient in quantity to aggregate the total minimum royalties for the term of the lease." *Id.* at 523.

As in *Babcock*, the minimum royalty provisions here are stated in absolute terms. Appellees must pay certain specified sums *in advance* for each of the first four years. No relationship exists between the payment schedule and any given quantity of coal that might be mined. Even beginning in the fifth year, when payments are calculated as a percentage of the current market price of 200,000 tons of coal, there is no requirement that such amount shall be mined and no stated contingency that pay-

ments shall be made only if such a quantity actually is mined. *See Lawson v. Williamson Coal & Coke Co.*, 61 W.Va. 669, 57 S.E. 258 (1907) (coal lease calling for payment of 10 cents per ton of coal mined and 15 cents per ton of coke made, with a minimum royalty of $5,000 per annum, imposed an "absolute undertaking" upon lessee, who was required to pay the royalty and taxes even though he never entered upon the land), 57 S.E. 258, 260; *Wiggins v. Warrior River Coal Co.*, 696 F.2d 1356 (11th Cir.1983) (minimum royalty provisions in a coal mining lease were "clear and certain," and summary judgment for lessor was appropriate, even though performance on lessee's part was impossible because it was unable to obtain mining permits).

Appellees point to *Bluestone Coal Co. v. Bell*, 38 W.Va. 297, 18 S.E. 493 (1893), applying the doctrine of mutual mistake of fact where there was no coal on the leased property. Their reliance is misplaced. The West Virginia Supreme Court recently characterized its holding in *Bluestone Coal* as resting in large part on the fact that "there were no minimum rental payments" required, *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W.Va. 489, 250 S.E.2d 128, 133 (1979). In a reconsideration of the doctrine of mutual mistake of fact only last year, the West Virginia court noted *Bluestone Coal* as an application of the doctrine but quoted with approval the definition in Restatement (Second) of Contracts § 152(1):

Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party *unless he bears the risk of the mistake ....*

Quoted in *McGinnis v. Cayton*, W.Va., 312 S.E.2d 765, 769 (1984) (emphasis supplied).

---

**3.** Nothing in this contract expressly warranted the quantity or quality of coal on the property. The court in *Babcock* noted that "Generally, there is no implied warranty in a lease for coal mining purposes that the lease contains coal of a definite quality and quantity." 37 S.E.2d 519, 523 (citations omitted). Like the court there, "we may not supply such warranty by construction." *Id.* at 524.

In the situation before us, *Babcock* and related West Virginia cases make it clear that under the lease, appellees bore the risk of the mistake. Hence, the doctrine of mutual mistake of fact is inapplicable.

## II

Goodell suggests that the presence of the cancellation clause removes this contract from the holding of *Babcock* and similar cases. His argument, however, leads in the opposite direction. The cancellation clause itself cushioned appellees' risk in the event that coal reserves were unsatisfactory. The failure of appellees to follow their contractual escape route does not entitle them to later courtroom rescue through mutual mistake of fact.

Appellees concede that they did fail to take the available course. There is no contention here that appellants, by word or deed, waived their right to written notice of termination as provided in the cancellation clause. There is no contention that appellants felt free to use the property unless proper notice of cancellation was provided. The value of a record in business dealings of this nature makes the form of notice more than mere formality. While appellees in their brief vaguely characterize the telephone call to Joseph Orlandi in the spring of 1979 as made "pursuant to paragraph (6)" of the lease, the trial court properly found that the written notice required by the provision had not been served.

*Wiggins v. Warrior River Coal Co.*, 696 F.2d 1356 (11th Cir.1983) is relevant here. In *Wiggins*, the presence of a minimum royalty provision together with a surrender clause sufficed to hold the contract valid as a matter of law, despite lessee's claim of impossibility of performance due to inability to procure the necessary mining permits. The Eleventh Circuit refused to submit the terms of the contract to the trier of fact, holding that the lease provisions were clear and reflected conscious risk allocation by the parties:

> Because the lease expressly covers the contingency in issue, the defendant may not avoid its promise. Impossibility does not excuse nonperformance where the promiser has indicated an intent to assume the risk thereof.

696 F.2d 1356, 1359 (citation omitted).

The effect of the termination clause is to soften the *Babcock* rule by alleviating the magnitude of risk assumed. Appellees could, at any time after determining a lack of merchantable and mineable coal, have relieved themselves of further obligations by dropping a letter in the mail, which, for reasons best known to themselves, they failed to do.

## III

The result here, where the lease continued in effect and where royalty payments escalated dramatically in the fifth year, may seem severe. Nevertheless, in the words of the *Babcock* court:

> If a party to a contract could be relieved from performance on the ground that no profit would accrue from its performance, the stability and binding force of most, if not all, contracts would be destroyed. It is of frequent occurrence in the business world that a party to a contract finds that its performance is onerous and unprofitable; nevertheless, good faith and fair dealing call for performance. Equity will not grant rescission on the ground that mining is unprofitable.

37 S.E.2d 519, 522. Here, there is no reason why the parties should not be held to the clear terms of the contract they negotiated. Accordingly, the judgment of the district court is reversed, and the case is remanded for entry of judgment in accordance with this opinion.

REVERSED AND REMANDED.