962 F.2d 365
 William T. BRIGHT; Patricia B. Bright, Plaintiffs-Appellants,
v.
COASTAL LUMBER COMPANY, a North Carolina corporation;
Pittsburgh National Bank, a National Banking Association;
Ned L. McClure and Ira B. Coldren, Jr., Trustees under the
Revocable Life Insurance Trust Agreement of Samuel Frazee,
Settlor, Defendants-Appellees.
 No. 91-2340.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1991.
Decided May 6, 1992.
 
 Gerard Ray Stowers, Charleston, W.Va., argued (F.T. Graff, Jr., John R. Teare, Jr., Bowles, Rice, McDavid, Graff & Love, on brief), for plaintiffs-appellants.
 Stephen Ambrose Weber, Kay, Casto, Chaney, Love & Wise, Charleston, W.Va., argued, for defendant-appellee Coastal Lumber; R. Terrance Rodgers, King, Betts & Allen, Charleston, W.Va., argued, for defendants-appellees Pittsburgh Nat. Bank, McClure, and Coldren (Karen Speidel Rodgers, Kay, Casto, Chaney, Love & Wise, Charleston, W.Va., for defendant-appellee Coastal Lumber; Robert B. King, King, Betts & Allen, Charleston, W.Va., for defendants-appellees Pittsburgh Nat. Bank, McClure, and Coldren, on brief), for defendants-appellees.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge,* and SHEDD, United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 William and Patricia Bright leased land in West Virginia in order to mine coal. After the Brights were unable to locate coal on the land, they sought a declaratory judgment that the leases either terminated by their own terms or by effect of a default notice that Coastal Lumber had sent. The Brights later added a fraudulent inducement claim. Coastal Lumber and the other defendants counterclaimed for continuing minimum royalties under the leases. The district court granted summary judgment against the Brights on the termination claims, while a jury returned a verdict against the Brights on the fraud issue and in favor of the defendants' counterclaim, awarding the defendants $418,000 for continuing minimum royalties. On appeal, the Brights challenge the district court's granting of summary judgment on the termination issues and four aspects of the trial. We affirm.
 
 I.
 
 2
 This case involves three different coal mining leases. The Brights approached the defendants about leasing approximately 7000 acres of land. The Brights' engineer reviewed documents about the land, and the Brights also explored the land for more than a year, drilling more than thirty-five exploration holes. Finally, after twenty-seven months of exploration and negotiations, the Brights and the defendants signed the leases in question.
 
 
 3
 Lease 1 and Lease 2 were very similar to each other in their terms, and both allowed the Brights to mine coal. Lease 1 was between the Brights on one side and Coastal Lumber Co., Pittsburgh National Bank, Ned McClure, and Ira Coldren on the other. Lease 2 covered a different tract of land and was only between the Brights and Coastal Lumber. Lease 3, or the "tipple agreement," covered a third tract of land and allowed for uses of the land besides mining. Like Lease 2, the tipple agreement was between the Brights and Coastal Lumber.
 
 
 4
 The granting clause in Leases 1 and 2 stated that the Brights were leasing the land "for the purpose of mining and removing all of the merchantable and mineable coal thereon and thereunder." The termination clause in Leases 1 and 2 stated:
 
 
 5
 The term of this lease shall be a period of ten years, commencing July 1, 1986, and ending June 30, 1996. This lease shall be automatically renewed for an additional term of one year and thereafter from year to year, until the coal underlying the leased premises has been exhausted. Lessees may terminate this lease at the expiration of the fourth year of the initial term or the expiration of any subsequent lease year by giving Owner written notice thereof at least 90 days before the expiration date. The coal underlying the leased premises shall be deemed to be exhausted when there is no longer any merchantable and mineable coal underlying the leased premises. As used herein, the term "merchantable and mineable coal" means coal which can be mined and marketed at a reasonable profit to lessees at the time such coal is reached in the course of lessees' mining operation by use of practical and efficient machinery, facilities, methods and management.
 
 
 6
 Because the tipple agreement did not address coal mining, it had a different termination clause, which allowed termination "[i]n the event that the lessees' coal operation shall become economically unfeasible for any reason or if the company ceases to operate a coal mine in the immediate vicinity."
 
 
 7
 For two years after the leases took effect, the Brights were unable to locate any merchantable and mineable coal on the land. Then, in August 1988, they stopped paying the minimum royalties that were due under the lease. Coastal Lumber notified the Brights on November 14, 1988 that they were in default and that "[i]f this default is not corrected within five (5) days of receipt of this notice, then th[ese] Coal Mining Lease[s] will be terminated." The Brights responded on December 2 that they had received the "letters dated November 14, 1988 which terminated our three lease agreements," and continued not paying minimum royalties. Coastal Lumber and the other defendants (collectively, hereinafter, "Coastal Lumber") then replied that the leases had not been terminated, leading to this litigation.
 
 
 8
 During jury voir dire, a potential juror named Marks said that he was a friend of one of Coastal Lumber's lawyers and that he had a financial interest in a pending lawsuit that also involved a coal mining lease, and that as a result he might have a "subconscious" bias that he could not rule out "one hundred percent." The Brights challenged Marks for cause. The district judge inquired further and decided that Marks could be a fair and impartial juror, rejecting the Brights' challenge. The Brights then exercised a preemptive challenge to excuse Marks from the jury.
 
 
 9
 In his opening statement, Coastal Lumber's counsel described the two termination issues and noted that the court had "disposed of" them. The counsel then characterized the Brights' remaining theory, fraud, as "lately contrived." To try to prevent these statements from prejudicing the Brights, the district court gave a curative instruction, explaining that a party's decision to change or add to its legal complaint is unremarkable.
 
 
 10
 During trial, counsel for Coastal Lumber asked a witness about a previous court finding, in a 1978 case, that the property the Brights had leased was valuable. The Brights' counsel objected and also stated that the finding had been otherwise. The district court sustained the objection and also told the counsel for both sides that he was concerned that the jury had heard the question asked and then contradicted without answer. The judge and the counsel discussed the matter twice more the next day, and the judge proposed to explain to the jury what the finding had been and that it had no bearing on this lawsuit. All the counsel consented, and the judge later so instructed the jury. His instruction included the fact that he had previously found the property to be worth $2,000,000.
 
 
 11
 Instructing the jury at the close of trial, the district court stated that the Brights had assumed the risk of the absence of coal in all three leases:
 
 
 12
 The two leases and the tipple agreement involved in this case are what is known as contracts of hazard. A contract of hazard in regard to coal mining leases means that the lessees, who are the plaintiffs in this case, assumed the risk that there was no merchantable and mineable coal on the leased property, including the absence of coal processed through the tipple that they leased.
 
 
 13
 After its deliberations, the jury returned a verdict rejecting the Brights' fraudulent inducement claim and awarded the lessors $418,000 for continuing minimum royalties under the three leases.
 
 II.
 
 14
 The Brights raise six issues on appeal, two based on the summary judgment and four arising out of the trial.
 
 A.
 
 15
 We begin with the summary judgment issues, bearing in mind that we review summary judgments de novo. See, e.g., Higgins v. E.I. Du Pont de Nemours & Co., 863 F.2d 1162, 1166-67 (4th Cir.1988). The Brights argue first that the first two leases terminated by their own terms due to the lack of "merchantable and mineable" coal on the land. As with any contract, we first examine the plain language of the leases. See, e.g., Sally-Mike Properties v. Yokum, 175 W.Va. 296, 332 S.E.2d 597 (1985). The parties appear to have intended the termination clause to govern the length of the leases, so we begin by analyzing that clause. The termination clause first states that the leases cover a ten year term. Next, the clause explains what is to happen at the expiration of the ten years: The contract remains renewable from year to year until the coal is "exhausted." Then, the clause provides that the Brights can terminate the lease after the fourth year or any additional year upon giving ninety days' notice. Finally, the clause defines when the coal will be deemed "exhausted," which is when there is no longer any merchantable and mineable coal underlying the land.
 
 
 16
 Thus, by the very terms of the leases, exhaustion of the coal, or merchantability/mineability, is only relevant after the original ten year term has expired. The leases only allow the Brights one way out--giving notice after four years. If the parties had intended to allow the lessees to terminate the lease if there was a total lack of merchantable and mineable coal underlying the land, they could have so stated. The court should not read terms into a contract when parties dealing at arm's length have not inserted them. See, e.g., R.E.X., Inc. v. Trio Foods Enters., Inc., 183 W.Va. 217, 395 S.E.2d 217 (1990).
 
 
 17
 In addition to the plain meaning of the first two leases, which appear to obligate the Brights to continue paying for at least four years, the law in West Virginia is that a lease for mining property constitutes a contract of hazard allocating all business risk to lessees. See Orlandi v. Goodell, 760 F.2d 78 (4th Cir.1985); Babcock Coal & Coke Co. v. Brackens Creek Coal Land Co., 128 W.Va. 676, 37 S.E.2d 519 (1946). In Orlandi, this court applied West Virginia law and held that a contract for minimum annual royalty payments cannot be rescinded on the ground of mutual mistake of fact when there is no marketable coal on the property. Orlandi, 760 F.2d at 80-81. Relying on Babcock Coal and other West Virginia cases, the Orlandi court held that the lessees bore the risk of mistake. The Brights argue that Orlandi stands for the proposition that parties may alter the common law rule that lessees bear the risk in contracts of hazard. We think that Orlandi is better viewed as not changing this common law rule when minimum royalty payments are not related to the quantity of coal that might be mined, as in our case. See id. at 81.
 
 
 18
 Despite the plain meaning of the termination clause and West Virginia common law, the Brights theorize that the "merchantable and mineable" language in the granting clause takes precedence over the termination clause and converts the lease from a term of years to a term of years with a provision for earlier termination if there is no "merchantable and mineable" coal under the land. Under the Brights' theory, we should remand for a trial on the issue of whether the leasehold contained any such coal and whether removal operations were economically feasible. However, the cases the Brights cite do not support their theory. The first case they cite, which they represent as "typical," actually involved what the court termed "peculiar circumstances." Browning v. Mountain States Coal Corp., 338 S.W.2d 220 (Ky.1960). The Browning court found that the parties intended to terminate the leases if a reasonable effort to sell coal at a profit was unsuccessful, basing its holding on the evidence that "everyone knew" that the coal in question was inferior and salable only in an extraordinarily good market. That was not the situation here. The Brights also misrepresent the second case they cite, Kentucky & West Virginia Coal & Mining Co. v. Blue Diamond Coal Co., 106 F.Supp. 274 (E.D.Ky.1952). The term of the lease in that case expressly depended on the presence of "mineable and merchantable" coal. Id. at 275. That is different from the Brights' leases, which are for a ten year term. Therefore, we reject the Brights' argument and affirm the district court's granting of summary judgment against the Brights on this issue.[1]
 
 
 19
 Alternatively, the Brights argue that Coastal Lumber's November 14, 1988 letters terminated the leases. The default provision in each of the leases stated:
 
 
 20
 17. DEFAULT BY LESSEE: Owner may terminate this lease and all of Lessee's rights hereunder upon the occurrence of any event of default. For this purpose, the following shall be considered events of default: (a) The failure of Lessee to make any payment due hereunder, if such failure continues for more than five days after Owner gives written notice thereof to Lessee.
 
 
 21
 On November 14, 1988, Coastal Lumber wrote the Brights:
 
 
 22
 In accordance with Item 17. DEFAULT BY LESSEE, Paragraph (a) on page 10 of the above described Coal Mining Lease ... Coastal Lumber Company does hereby give notice that the Coal Mining Lease is in Default by two months Advance and Minimum Royalty Payments of Twenty Thousand Dollars ($20,000.00). If this default is not corrected within five (5) days of receipt of this notice, then this Coal Mining Lease will be terminated.
 
 
 23
 The Brights' theory is that the leases terminated five days after they received Coastal Lumber's letters, under the terms of the letters themselves. We reject that interpretation. Read in conjunction with the leases, the only sensible reading of the letters is that they were "notices to cure" informing the Brights that Coastal Lumber could terminate the leases after five days. See Texas & N.O.R. Co. v. Phillips, 196 F.2d 692, 693-94 (5th Cir.1952). The leases stated that Coastal Lumber "may" terminate five days after giving notice. While the letters used the term "will" instead of "may," the phrase "will be terminated" indicated that a final termination was still to come. The letters in no way suggested that they would spring to life after five days in order to terminate the leases or that the Brights had a unilateral right to terminate the leases. Therefore, we affirm the district court's granting of summary judgment against the Brights.
 
 B.
 
 24
 The Brights also challenge four aspects of their trial.[2] First, they argue that the district court should have excused juror Marks for cause. This court has ruled that "[a] trial judge has very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." Poynter v. Ratcliff, 874 F.2d 219, 222 (4th Cir.1989). In Poynter, a medical malpractice case, the trial court had decided not to excuse for cause a juror who was a patient of one of the defendant doctors and a juror who was a defendant in another medical malpractice suit. The Poynter court noted that:
 
 
 25
 A juror is presumed impartial and the existence of a preconception is insufficient to rebut this presumption if the juror can "lay aside his impression or opinion and render a verdict based on the evidence presented in court."
 
 
 26
 Id. at 221 (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)). The court then held that the district court had not abused its discretion in deciding not to excuse the two jurors. Id. at 222 (citing United States v. Jones, 608 F.2d 1004, 1007-08 (4th Cir.1979) (holding judge in bank robbery prosecution did not abuse discretion in refusing to excuse juror whose wife was bank employee or juror whose daughter had been victim of bank robbery). Here, Marks assured the court that he could be impartial. He had been a friend of Coastal Lumber's counsel fifteen years before, when they were on the same bowling team, but at the time of trial they only saw each other occasionally at church or chance meetings. Marks referred to another coal mining lawsuit that might have a "subconscious effect" on him, but that other suit involved Marks' mother, not Marks, and the district judge questioned Marks further about it before deciding that Marks could be impartial. In any event, Marks did not serve on the jury because the Brights removed him with a peremptory challenge. Furthermore, the Brights have made no showing that using a peremptory challenge on Marks prevented them from challenging another undesirable juror. We conclude that the district court did not abuse its discretion in deciding not to excuse Marks for cause.
 
 
 27
 Next, the Brights claim that improper comments by Coastal Lumber's counsel during his opening statement entitle the Brights to a new trial. In rejecting a similar claim, this court has stated:
 
 
 28
 [W]here counsel's references to inadmissible or unprovable facts are so flagrant or inflammatory as to affect the fairness of the trial, it is within the sound discretion of the trial judge to take such remedial action as he deems proper, including, if he considers such action appropriate, a mistrial and the exercise of such discretion will not ordinarily be disturbed unless clearly erroneous.
 
 
 29
 Maxworthy v. Horn Elec. Serv., Inc., 452 F.2d 1141, 1144 (4th Cir.1972) (footnotes omitted). In Maxworthy, a husband and wife sued to recover damages they sustained in an automobile accident. In an opening statement, their counsel referred to the likelihood of their divorce as an element of the husband's cause of action for loss of consortium. Because their possible divorce was either inadmissible or unprovable, the district court instructed the jury not to consider the likelihood of divorce in assessing damages under the consortium action. The Maxworthy court found that the instruction had removed any possibility of prejudice to the defendants and held that the district court had not abused its discretion. Id. at 1144. Here, Coastal Lumber's counsel detailed the procedural history of this case and described the Brights' fraud claim as "lately contrived." As in Maxworthy, the district court gave a curative instruction, which included the statement "that there isn't anything unusual about complaints being amended to add causes of action." The instruction implied that Coastal Lumber had made either a meaningless or a deceptive argument, so any lasting effect from the opening statement should have worked in the Brights' favor. In any event, we certainly find no abuse of discretion in the district court's action.
 
 
 30
 A third issue from trial is the admission of evidence about a previous court finding in an unrelated case that the property the Brights leased was worth $2,000,000. The admission of evidence rests within the sound discretion of the district court and will not be reversed absent abuse of that discretion. Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1436 (4th Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986). While it appears likely, as the Brights argue, that Coastal Lumber was determined to present this irrelevant evidence to the jury, the district court was understandably concerned about a statement made by the Brights' counsel. When Coastal Lumber first asked a witness about the previous finding, the Brights' counsel objected and stated, "I don't know that I have a copy of the ruling with me, but ... that is not my recollection of the court's ruling." The district court sustained the objection. Later, after Coastal Lumber's counsel argued that the sustained objection had placed his credibility in issue, the district court expressed its concern "about the fact that [Coastal Lumber's counsel] posed a question which was objected to and was based on an accurate statement of that which appeared in that order." When Coastal Lumber next questioned a witness about the previous finding, the district court admitted into evidence the previous court order making that finding, explained the context in which it arose, and stated to the jury:
 
 
 31
 I note to you that that finding by the court on that occasion is not binding on this court in this proceeding or this jury in this case, and I note as well that the court's finding in that instance is not relevant on the issue of the actual value of the coal mining property as it comes to you in this case.
 
 
 32
 While it is unfortunate that the parties referred to the previous finding in the first place, we hold that the district court did not commit an abuse of discretion in deciding to admit the evidence while giving a limiting instruction.
 
 
 33
 Finally, the Brights challenge the district court's jury instruction that the Brights assumed the risk under all three leases that there would be no merchantable and mineable coal on the property. We find no error in the instruction as to the first two leases. See discussion of Orlandi, supra. However, the tipple agreement allowed the Brights to terminate it for economic unfeasibility. The right to stop paying minimum royalties upon economic unfeasibility appears to be incompatible with assumption of the risk that there would be no merchantable and mineable coal, because a party that assumes such a risk is obligated to continue payments under the lease. That is especially true in this case, where the parties defined "merchantable and mineable coal" as "coal which can be mined and marketed at a reasonable profit." If, in the tipple agreement, the Brights assumed the risk of no merchantable and mineable coal, that assumption would render the economic unfeasibility provision in that lease meaningless. Therefore, we determine that the district court's instruction was erroneous as to the tipple agreement.
 
 
 34
 Although we have found the jury instruction partly in error, we find that the error was harmless. As stated above, the trial concerned the Brights' fraudulent inducement claim and Coastal Lumber's crossclaim for continuing minimum royalties. At trial, there was abundant evidence that either no misstatements occurred or that the Brights had not relied on any misstatements or concealments. The Brights argue that the partly erroneous instruction may have "confused the jury to the point that they would have believed that even if there was a failure to disclose information to the prospective lessees, the lessees assumed the risk that no coal would exist in any event upon the property." Appellant's Brief at 24. We see no merit to this argument, which is equivalent to saying that the jury may have believed that there was no longer any fraud claim to be decided. The jury could not have been so misled, because they were instructed on the elements of fraud and specifically found that Coastal Lumber had not committed fraud.
 
 
 35
 Because we have found no reversible error, the judgment of the district court is hereby
 
 
 36
 AFFIRMED.
 
 
 
 *
 Judge Niemeyer recused himself at the time of oral argument and the case was heard by a majority of the panel
 
 
 [1]
 As noted above, the tipple lease allowed the Brights to terminate it for "economic unfeasibility" upon the giving of sixty days' notice. Although the Brights claim to have experienced "economic unfeasibility," they do not dispute Coastal Lumber's point that they failed to give the required notice. The Brights also argue that reading Lease 1 and Lease 2 in conjunction with the tipple lease reveals that the whole agreement was premised on economic feasibility, but we think that gives too much weight to the tipple lease's escape clause. Thus, like Lease 1 and Lease 2, the tipple lease did not terminate by its own terms
 
 
 [2]
 In addition to the summary judgment and trial issues, the Brights also challenge the district court's granting of a directed verdict in favor of the trustees on the fraud issue. The district court reasoned that the trustees could not have committed fraud through the actions of Coastal Lumber because Coastal Lumber had not acted as the trustees' agent. The Brights challenge the district court's ruling that Coastal Lumber did not act as the trustees' agent. Because the jury found that Coastal Lumber had not committed fraud, we think the question of whether Coastal Lumber acted as the trustees' agent is moot. Therefore, we do not consider the question of whether the district court erred in granting the directed verdict. The question of whether Coastal Lumber acted as the trustees' agent in sending the November 14, 1988 letters is also moot, because we have held above as a matter of law that the letters did not terminate the leases