PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.                                                 No. 03-4719

WILLIAM IVON TURNER,
              *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, District Judge.
(CR-03-12)

Argued: October 1, 2004

Decided: November 16, 2004

Before WIDENER and WILKINSON, Circuit Judges,
and Robert E. PAYNE, United States District Judge
for the Eastern District of Virginia,
sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Widener and Judge Payne joined.

---

**COUNSEL**

**ARGUED:** Michael Allen Bragg, Abingdon, Virginia, for Appellant.
Jennifer Rebecca Bockhorst, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Vir-
ginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States
Attorney, Abingdon, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

William Ivon Turner robbed the Bank of Marion, in Smyth County, Virginia, and then car-jacked an automobile. A jury convicted him of armed robbery, carjacking, and violating federal gun and conspiracy laws. Turner was sentenced to life imprisonment. He now appeals on several grounds. First, he claims that the trial court erroneously failed to excuse members of the jury venire who held accounts in different branches of the Bank of Marion. Second, he argues that there was insufficient evidence to support a conviction under 18 U.S.C. § 2113(e) (2000), which penalizes forced accompaniment during a bank robbery. Finally, he disputes that the statutory maximum sentence under that statute is life in prison. We are unwilling to create a novel per se rule for juror disqualification, which would unjustifiably impede the role of the trial judge. Moreover, Turner's statutory arguments fall short of the mark. We therefore affirm the judgment in all respects.

I.

A.

Shortly before the close of business on December 26, 2002, Turner entered the Royal Oak branch of the Bank of Marion. Seated at her desk was Judy Cregger, the bank manager. Turner told her that he wished to open an account. As she approached him, he lifted his shirt to reveal a gun stuck in his belt, and said, "Ma'am, we're going to the vault." Cregger got the keys and led him to the vault. There he produced a pillowcase, ordering her to fill it with money. She placed some 12,000 one dollar bills in it, and told him that was all she had. The rest of the bank staff — no other customers were present — was unaware of the robbery until Turner, exiting the vault with the money, brandished his gun and ordered the tellers to get inside the vault. Once they were all inside, he left the bank and joined his companion, Merrie Ellen Reid.

Cregger left the vault less than two minutes after Turner ordered the group inside and managed to see a large white car with Florida

tags leave the parking lot. A witness arrived at the bank parking lot during the robbery and saw Turner get into the car. Turner and Reid headed north onto Interstate 81. At around 5:30 that evening, the police pulled the car over. They saw only Reid in the front seat. Before the officers could get a view of the back seat, Reid sped off. She eventually parked at a rural home after apparently having car trouble. Living there was eighteen-year old Sean Hildreth, whom she asked for a ride to the store. He agreed. Before he pulled away, Turner appeared, begged for a ride, and jumped in.

The police, who had been chasing Reid and Turner, saw the white car on Hildreth's property and at the same time saw Hildreth turn from the driveway. An officer of the State Police activated his lights to pull Hildreth over. Hildreth stopped the car in a high school parking lot, and the officer approached. Noticing Turner in the back seat, the officer reached for his weapon. Turner pointed his gun at the officer and the officer fled. Turner then put the gun to the back of Hildreth's head, and said, "Drive." When Hildreth was too scared to drive, Turner ordered him out of the car and assumed the driver's seat. Before Turner could leave, officers surrounded the car. They arrested Turner and Reid, and recovered Turner's gun and the pillowcase with $12,000 in it.

## B.

Turner was indicted by a federal grand jury on January 8, 2003, and charged with nine counts: four counts of conspiracy, one count of aggravated armed bank robbery, one count of carjacking, two counts of possessing a firearm in furtherance of a crime of violence, and one count of possession of a firearm while being a felon and/or illegal user of controlled substances.

Jury selection commenced on March 27, 2003. No veniremen answered in the affirmative when the district judge asked if they held stock in the Bank of Marion, a federally-insured bank based in Marion, Virginia, with 12 branches. However, defense counsel ascertained that two veniremen held accounts in the Bank, but not at the Royal Oak branch where the crime occurred. Turner argued that these veniremen should be struck for cause, but the trial court declined to strike them.

During the trial, Reid testified that Turner had not robbed the bank, but that a man she called "Boogie" had done so. Boogie forced her to drive away, she said, and ran into the woods when the car was stopped at Hildreth's home. Reid claimed that Turner had slept through all the commotion. The jury concluded otherwise, convicting Turner of having perpetrated the crime as recounted above. The judge sentenced Turner to life imprisonment for four counts, and a period of years on the remaining counts.

Turner unsuccessfully raised three claims which he now brings on appeal. First, he asserts that his trial was tainted because the district judge did not strike the veniremen who held accounts in the Bank of Marion. Second, he argues that even if this was not error, the district court wrongly subjected him to conviction under the federal statute that penalizes "forced accompaniment" in the commission of a bank robbery. *See* 18 U.S.C. § 2113(e). Third, he claims that even if he were properly convicted under § 2113(e), the statutory maximum under these circumstances is 25 years, not life in prison as the district court held.

## II.

Turner complains that the trial court did not strike for cause two veniremen who banked at a different branch of the Bank of Marion than the one that was robbed. Because all accounts were centralized, Turner argues that the veniremen were financially interested in the case and were biased per se.

We review challenges to the qualifications of jurors under an abuse of discretion standard. *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979). It is the settled law of this circuit that a district judge retains a "very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989).

An abuse of discretion can be found in either of two ways. First, a district court abuses its discretion if it ignores a per se rule of disqualification after counsel moves to exclude a venireman. Second, if the court demonstrates a clear disregard for the "actual bias" of an

individual venireman, reversal is justified. We consider both possibilities in turn.

### A.

Turner seeks a per se rule disqualifying from jury service depositors of a robbed bank, even when the accounts are held in different branches. He thinks the rule should especially apply when the bank is small and regional, like the Bank of Marion with its twelve branches. But appellate courts are loath to announce such per se rules. "[U]nder our system it is [the trial] judge who is best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). Per se rules of disqualification interfere with the trial court's administration of jury selection. Trials courts are expert at finding and applying facts, particularly in the conduct of a trial. Per se rules, by contrast, create situations in which no set of facts can allow the judge to utilize this expertise and discretion. This inverts our deferential standard of review. A list of per se exclusions "would burden the courts needlessly with a responsibility of endless speculation on the presumptive bias of potential jurors." *United States v. Brown*, 644 F.2d 101, 105 (2d Cir. 1981).

We have long refused to manage jury selection from the court of appeals through promulgating rules of automatic disqualification. In *Jones*, we reviewed a conviction for armed robbery of a bank under the same statute Turner violated. Jones challenged veniremen whose spouses worked at a bank or whose relatives had been bank robbery victims. But "[w]e decline[d] to establish a per se rule of disqualification where a juror is related to a victim of a similar crime." *Jones*, 608 F.2d at 1008. In *United States v. Loucas*, 629 F.2d 989, 992 (4th Cir. 1980), we refused to direct district courts "to strike jurors for cause because they have sat on prior similar cases." In *Poynter*, we refused to "adopt per se rules disqualifying potential jurors in medical malpractice lawsuits who are current patients of a defendant doctor or who are themselves defendants in a pending medical malpractice suit." *Poynter*, 874 F.2d at 222. In *Bright v. Coastal Lumber Co.*, 962 F.2d 365 (4th Cir. 1992), a lawsuit about coal mining leases, we refused to create a per se exclusion even when the potential juror acknowledged the possibility of a "subconscious bias" because the juror had a financial interest in a different coal mining lease lawsuit

and was a friend of defendant's counsel. *Id.* at 367, 370. These facts did not require automatic disqualification, but were relevant circumstances for the district judge to consider when assessing the prospective juror's impartiality. *Id.* at 370.

In spite of this precedent, Turner now asks us to craft a per se rule under which trial courts in a bank robbery trial must disqualify veniremen who hold accounts in the bank. The burden on any litigant seeking to disturb our settled practice of rejecting per se challenges is a heavy one. A rare instance in which a plaintiff met that burden came in *Chestnut v. Ford Motor Co.*, 445 F.2d 967 (4th Cir. 1971). In *Chestnut*, one prospective juror owned 100 shares of Ford stock. The district court refused to strike him for cause, which we found to be reversible error. The proposition "[t]hat a stockholder in a company which is a party to a lawsuit is incompetent to sit as juror is so well settled as to be black letter law." *Id.* at 971. *See also Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1050 (4th Cir. 1984).

Turner's argument for creating another per se rule, however, is wide of the mark. The single precedent of *Chestnut* does not support Turner's very different case. Depositors of a federally-insured bank that is robbed are unlike shareholders of a corporation defending itself in a civil suit. Shareholders stand to gain or lose by the fortunes of the corporation, because theirs is an equity interest. Depositors' only stake is receiving their principal and interest, so robberies do not harm them in the same way that stock drops affect investors. Federal insurance does not protect shareholders' investments. Being federally insured — the only reason this robbery was a federal crime in the first place — means that most depositors will receive their account balance *regardless* of robberies or even bank failures. This level of security has played an important role in the financial history of this country, and ignoring it would be foolish.

These considerations fuel the conclusion that whatever bias inheres in the status of a stockholder is not, at least as a matter of law, to be attributed to a bank depositor. We emphasize that we are simply passing on the legal question. It is conceivable that a bank depositor would have such an affinity for his local bank, or perhaps have had years of friendly relations with its staff, that he would be too biased

to serve even if he did not use the branch that was robbed. But these are questions of fact, relevant to our discussion of actual bias below.

We are not alone in rejecting a per se rule of disqualification. Other courts considering jury selection in bank robbery cases have reached similar conclusions. In an armed robbery and conspiracy case remarkably similar to Turner's, the Ninth Circuit refused to impose a per se exclusion on jurors who "banked at a different branch of the Southwest Bank than the one that was robbed." *United States v. Panza*, 612 F.2d 432, 440 (9th Cir. 1980). The Fifth Circuit also considered such a challenge for cause, concluding that "[t]he fact that a juror is a depositor of the bank in question does not automatically require his disqualification." *Goodman v. United States*, 511 F.2d 706, 707 (5th Cir. 1975). In *United States v. Brown*, 644 F.2d 101 (2d Cir. 1981), the Second Circuit considered an armed robbery in which a prospective juror was an employee of another branch of the very bank that was robbed. Although an employee's stake — both emotionally and financially — would appear to be far greater than a depositor's, the court found that this status would not lead to automatic disqualification. *Id.* at 104-05.*

We repeat that the case law does not *approve* the use of jurors who are bank employees at a different branch, patients of defendants, former jurors in comparable cases, or defendants in similar suits. Rather, it simply declines to impose a per se rule of disqualification. As we stated in *Poynter*, "a particular patient or malpractice defendant might warrant, or require, excuse for cause in a given case," *Poynter*, 874 F.2d at 222, but the status of being a patient or malpractice defendant

---

*We recognize that *United States v. Allsup*, 566 F.2d 68, 71-72 (9th Cir. 1977), held that tellers of different branches of the bank that was robbed should be excused for cause, as they might fear similar robberies. But the other circuits which have cited *Allsup* have done so to reject it. *See, e.g.*, *Brown*, 644 F.2d at 104-05 (rejecting *Allsup*); *United States v. Torres*, 128 F.3d 38, 46 n.11 (2d Cir. 1997) (reiterating that rejection). The Ninth Circuit itself has retreated, limiting *Allsup* to its facts. *United States v. Panza*, 612 F.2d 432, 441 (9th Cir. 1979). In this circuit, *Allsup* has been cited in dissent, but in a case where the majority clearly rejected *Allsup*'s reasoning. *See Jones*, 608 F.2d at 1009 (Murnaghan, J., dissenting).

does not create per se legal impairment, in the same way that stock ownership does. This is equally true of bank depositors: the district judge should factor this status into his informed discretion, in light of all the circumstances. The district court was correct, though, that being a bank depositor, without more, does not require excuse for cause.

Thus, the proper way to proceed is show actual bias, not to invoke a per se rule. We shall next address this question.

## B.

"Challenges for cause are typically limited to situations where actual bias is shown." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). This is because "the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Id.*

As a matter of law, the trial court is to exclude veniremen who cannot be impartial. "[A] juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court." *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984). "[T]he trial court's findings of impartiality might be overturned only for 'manifest error.'" *Id.* at 1031 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). "Deference [is] due to the trial court's conclusions on that question," *id.* at 1038 n.12, which is why the Supreme Court has crafted the "manifest error" standard. *See Irvin*, 366 U.S. at 723-24. Moreover, "[t]he burden of proving partiality is upon the challenger." *Jones*, 608 F.2d at 1007 (citing *id.*). *See also Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (adversary must demonstrate partiality through questions). Traditionally, we limit the method of demonstrating partiality to voir dire. *Id.* at 428.

Lacking a per se rule, Turner can only allege that the particular veniremen were actually biased and that the judge abused his discretion in failing to excuse them for cause. Determination of actual bias has always been contextual in our circuit. Judge Parker explained what is required of a district court in jury selection in *Neal v. United*

*States*, 22 F.2d 52 (4th Cir. 1927). Our review, based on the record, is to verify that "the trial judge [was] very careful to see that the jury obtained is fair and impartial." *Id.* at 53. This is primarily a matter of ensuring that the judge allowed sufficient information to come forward so that he could exercise his discretion in an informed way.

> [A]lthough ordinarily the question as to whether a juror is fair and impartial is a matter addressed to the discretion of the trial judge, we think that the judge is bound either to make or to permit such inquiries to be made as will enable him in the exercise of his discretion to exclude from the jury persons who have formed fixed opinions about the case and are not fair and impartial jurors within the contemplation of the law. This is true in all cases . . . .

*Id.*

In this case, the district court solicited sufficient information to ensure Turner an impartial jury. Along with other avenues of inquiry, he specifically probed for bias with respect to the potential financial interest of the jurors. He asked the entire venire:

> Do any of you own any stock or other interest in the Bank of Marion? Any of you, member of your family open any stock or other interest in the Bank of Marion? Now, those three people who said that they had some connection with people who had worked or did work for the Bank of Marion . . . would that make it difficult for any of you to be fair and impartial in this case?

The transcript indicates that the veniremen all indicated it did not, because the judge then noted, "I take it it would not."

Turner's counsel uncovered something in his own questions that the judge's questions did not. This was that two veniremen, Sneed and Williams, held accounts in the Bank of Marion, albeit in a branch other than the one Turner robbed. Given that we are unwilling to recognize a per se rule, however, Turner would have to do more than reiterate the fact that the challenged jurors were depositors. Demon-

strating partiality was Turner's burden. Yet counsel declined to probe further in search of actual bias. Toward the end of voir dire, the judge called some veniremen into the courtroom for individual questioning. Williams was one of them. The judge confirmed his account status, and then asked, "Any of the lawyers have any further questions?" None replied, so the judge allowed Williams to step outside. And although the two defendants shared ten peremptory strikes with a jury pool of twenty-eight, Williams still was called to serve on the jury.

The process of jury selection in this case was a conscientious one. Other jurors did business at the branch that was robbed, and knew Cregger because of their visits to the bank. The judge excused them, in one case because "he knew one of the employees there, he has an account and visits there." The trial court's refusal to strike Sneed and Williams does not approach an abuse of discretion. Concluding that the veniremen could be impartial was entirely reasonable and supported by the record. Even if it were not, defense counsel made no effort to probe the two challenged veniremen beyond determining their depositor status. In the absence of a per se rule this simply cannot show actual bias; even defense counsel did not find Williams sufficiently biased to strike.

### III.

Turner next argues that he was improperly convicted of forced accompaniment during an armed bank robbery. The relevant statute reads as follows: "Whoever, in committing any offense defined in this section, . . . kills any person, *or forces any person to accompany him without the consent of such person*, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment." 18 U.S.C. § 2113(e) (2000) (emphasis added). Turner claims that he could not be convicted under this provision because, as a matter of law, the evidence was sufficient to convict him of only "ordinary" bank robbery. Turner's directions to Cregger, he says, were the kind of orders incident to any armed robbery. Under his reading of the statute, only forcing someone out of a building, or perhaps taking hostages, can trigger the forced accompaniment requirement of § 2113(e).

We review questions of law, such as statutory interpretation, de novo. *See, e.g.*, *Ramey v. Dir., Office of Workers' Comp. Programs*,

326 F.3d 474, 476 (4th Cir. 2003); *United States v. Davis*, 98 F.3d 141, 144 (4th Cir. 1996). We rely first on the statutory text, for "[w]here the statute speaks clearly to the issue at hand, the inquiry ends." *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 986 (4th Cir. 1996). We hold that § 2113(e) includes no property-line or threshold requirement. By its plain terms, the statute reaches a defendant who forces any person to accompany him, without that person's consent, if the accompaniment happens during a bank robbery or as part of an escape. The statute does not require that the accompaniment extend beyond the walls of the bank, and we cannot engraft onto § 2113(e) an element that Congress did not see fit to include.

Whether Turner's conduct included forced accompaniment was, therefore, a question the district court properly reserved to the jury. Turner used the threat of a gun to force Cregger into the bank vault, where she remained out of sight and at his mercy. He pressured her while she filled the pillowcase, asking her several times "where the other money was." Perhaps, as Turner argues, this was no more than an "ordinary" bank robbery. But whether his actions were routine or instead amounted to forcing Cregger to accompany him are questions best left to the trier of fact. By convicting him, the jury found that he did force the accompaniment. The evidence clearly allows such an inference, and we will not disturb the jury's finding.

It may be, as Turner suggests, that most forced accompaniments include crossing the threshold of the bank. But Congress can criminalize that which is uncommon, as it did in penalizing forced accompaniments occurring entirely inside a bank. "We agree with the Eleventh Circuit that the text of the statute contains "no requirement that the government prove that the defendant crossed a property line. Nor does the statute require that the [victim] traverse a particular number of feet, that [she] be held against [her] will for a particular time period, or that [she] be placed in a certain quantum of danger." *United States v. Bauer*, 956 F.2d 239, 241 (11th Cir. 1992). In *Bauer*, as here, the defendant "never left the bank's property with his hostages." *Id.* It is true that Bauer had planned to leave with his hostages but thought better of it upon finding the bank surrounded by police. But it is also true that, while inside the building, "without the consent of these frightened women, Bauer forced the women at gunpoint to accompany him from the back of the bank to the front door." *Id.* Such

a literally forced accompaniment, not the contemplated yet aborted forced accompaniment, is what brought Bauer within the statute.

Because the evidence supports the jury's conclusion that Cregger was forced to accompany Turner during his armed robbery of the bank, we affirm his conviction.

IV.

Turner's final objection is relevant only because we have affirmed the conviction under § 2113(e). He was sentenced to life imprisonment under this section, but argues that the maximum penalty, unless "death results," must be 25 years.

We review questions of statutory interpretation de novo. *Davis*, 98 F.3d at 144. Because the text of the statute fits the traditional rule that an unstated statutory maximum grants discretion to sentence up to life in prison, and because the statute's structure justifies application of that rule here, we affirm the life sentence imposed by the district court.

A.

Section 2113(e) covers the forced accompaniment of any person by a defendant during a bank robbery. In so doing, it contemplates two categories of defendants: those whose crime results in a death, and those where no death results. When a death occurs, defendants "shall be punished by death or life imprisonment." § 2113(e). Turner's robbery did not lead to a death. For cases like his, Congress imposed a mandatory minimum of ten years, but left unstated any maximum punishment. Statutory maximums do appear in other provisions of § 2113. For instance, in § 2113(d), penalizing the use of a dangerous weapon in a robbery, the punishment may not exceed 25 years. Turner thinks that this maximum governs § 2113(e) due to Congress's failure to state otherwise.

Turner fails to acknowledge the sensible rule of statutory construction whereby the absence of a specified maximum simply means that the maximum is life imprisonment. By declining to limit the penalty,

Congress gives maximum discretion to the sentencing court. And when Congress places sentencing at the discretion of the court, "courts have interpreted [such a] statute as intending to authorize a maximum of life imprisonment." *Walberg v. United States*, 763 F.2d 143, 148 (2d Cir. 1985). It is not bizarre that Congress would decline to state a maximum. Construing the precursor to § 2113, whose relevant language is identical, the Tenth Circuit reached the same conclusion. It felt that the mandatory minimum, with the language "not less than ten years," mandated "a minimum but clearly impl[ied] that more may be imposed." *Binkley v. Hunter*, 170 F.2d 848, 849 (10th Cir. 1948). "There are many laws such as this upon the statute books of the Federal Government, as well as of the various states, fixing a minimum sentence and leaving it within the power of the court to fix the maximum sentences." *Id.*

We have followed this default rule, even regarding § 2113(e) in particular, but found it so self-evident as to not need explanation. In *Crawford v. United States*, 519 F.2d 347 (4th Cir. 1975), *overruled on other grounds by United States v. Whitley*, 759 F.2d 327 (4th Cir. 1985), we observed that this subsection "prescribes a minimum penalty of ten years and a maximum penalty of life imprisonment." *Id.* at 351. Significantly, in *Crawford*, as here, no death resulted from the crime. We have thus always understood the very statute that Turner was convicted under to permit a maximum sentence of life imprisonment. We will not depart from that understanding now.

### B.

In a rare case, the general rule that an unstated statutory maximum permits a life sentence could be undercut by something else in the statute's text or structure. This might be true, for instance, if a greater crime, also defined in the statute, is punishable by a sentence less than life. But here, far from casting into doubt our conclusion that the maximum authorized sentence for Turner is life imprisonment, the statute's structure bolsters it.

The structure of the statute shows that Congress began with the most basic bank robberies, in § 2113(a), (b) and (c), and proceeded to the more serious forms in § 2113(d) and (e). More particularly, we have held that subsection (d) is a lesser included offense of subsection

(e). *Whitley*, 759 F.2d at 331. All of the elements required under § 2113(d) are elements under § 2113(e). Further, as noted earlier, sub-section (e) contains two categories: if death results and if no death results. It makes sense that, as the seriousness of the statute's offenses increases, the severity of the potential punishment increases as well.

Unsurprisingly, this is precisely what the statute does. A conviction under § 2113(d) *must not* be greater than 25 years. On the other hand, if death results under § 2113(e), the penalty *must* be death, or life in prison. Turner's offense — forced accompaniment without resulting death — fits between these two extremes. This presents a classic case where the default rule is sensible. All else being equal, § 2113(e) con-victions without a resulting death are less severe than such convic-tions with one, but more severe than § 2113(d) convictions. A § 2113(d) violation meriting the full 25 years, for instance, when combined with forced accompaniment under § 2113(e), justifies a higher sentence; consequently, the statute grants discretion to sen-tence such defendants to longer terms than those guilty only of the elements in § 2113(d).

The absence of a stated maximum speaks plainly to Congress's intent in this statute. When Congress insisted that a robber receive no less than life, it said as much; when it wanted a robber to receive no more than 25 years, it said that too. For cases in which death does not result under § 2113(e), Congress took the trouble to add a mandatory minimum of ten years. Striking out the 25 year maximum from § 2113(d) was not an oversight, but a literal lifting of the ceiling. The structure of the statute does not undercut the general rule; indeed, it shows why the general rule makes sense. We therefore affirm Tur-ner's life sentence.

## V.

For the foregoing reasons, the judgment is

*AFFIRMED.*