**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-4601**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANDRE DEWAYNE WILLIAMSON, a/k/a A3,

Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., Senior District Judge. (2:22-cr-00154-1)

─────────────

Argued: January 30, 2026                    Decided:  April 30, 2026

─────────────

Before WILKINSON, GREGORY, and QUATTLEBAUM, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

─────────────

**ARGUED:**  Richard W. Weston, WESTON LAW, Huntington, West Virginia, for Appellant.  Joshua Clarke Hanks, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Lisa G. Johnston, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

─────────────

QUATTLEBAUM, Circuit Judge:

In this appeal, Andre Dewayne Williamson challenges the district court's denial of his request for a new trial based on a juror's bias and dishonesty during voir dire. The juror did not disclose that he had previously been the target of a federal law enforcement probe for his role in a corrupt scheme in Mingo County, West Virginia. But, despite finding that the juror had been dishonest, the district court found no evidence that he was biased or that truthful answers would have required the juror be struck. As a result, it denied Williamson's request for a new trial, finding that he was not deprived of a trial by an impartial jury. Because we find the district court did not abuse its discretion, we affirm Williamson's conviction.

## I.

## A.

A federal grand jury indicted Williamson on five counts of distributing fentanyl in violation of 21 U.S.C. § 841(a)(1) and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). The case proceeded to trial. During jury selection, the district court asked prospective jurors if they or any of their immediate family members had "ever been employed as a law enforcement officer in any capacity." J.A. 516. One of the jurors—whom we will call the Juror—raised his hand, and the court called on him to explain further.

> PROSPECTIVE JUROR: . . . I'm a retired police chief for the City of Williamson, Mingo County, West Virginia.
>
> THE COURT: And how long did you serve in that capacity?

2

PROSPECTIVE JUROR: As chief -- I served two years as chief. Prior to that, I came up through the ranks, started as patrolman, and made sergeant, lieutenant, and later became chief.

Prior to that, I worked for Lee County Sheriff's Department in Fort Myers, Florida, as a deputy sheriff there. Prior to that, with the Logan Police Department, in Logan County, West Virginia.

THE COURT: How long have you been a police officer?

PROSPECTIVE JUROR: 33 years.

THE COURT: And retired now?

PROSPECTIVE JUROR: Yes, sir, I am.

THE COURT: Thank you. Would that experience have any bearing upon your ability to serve as a fair and impartial juror in the trial of this case?

PROSPECTIVE JUROR: No, sir. No, sir, it wouldn't.

J.A. 518.

After that colloquy, the court permitted defense counsel to question the Juror outside the presence of the rest of the panel:

Q. Sir, I just have a few follow-up questions, really based on the extent of your employment and previous law enforcement experience.

In your years as -- were you the Chief of Police for a period of time?

A. Yes, sir. I was the Chief of Police there. I also headed up the drug task force between Mingo County and our department and several other departments.

 . . . .

Q. And what was the name of the task force at the time?

A. Well, we didn't have -- it wasn't -- it was an unnamed task force. It wasn't one, per se, that's been sponsored by the state. It was a volunteer type task force that we would pull members from that work different areas of the county.

3

Q. What years?

A. Shoot -- a lot of years, a long time. Let's see -- up until 2013, when I retired.

Q. And were you doing the drug investigation work up until that time?

A. Yes. Yes, sir.

Q. And what -- what police agencies did you work with?

A. West Virginia State Police, worked with DEA some, and worked with, of course, our department, the 119 Task Force in Logan, Delbarton City Police, Matewan City Police, Gilbert City Police, Mingo County Sheriff's Department.

Q. And I know that you've heard, since these proceedings started, there has been reference to a confidential informant?

A. Yes.

Q. And in your experience, did you ever deal with investigating crime and using a confidential informant?

A. Many.

Q. Many?

A. Yes, many.

Q. So, obviously, you're familiar with how that works?

A. Yes. Yes, sir, I do.

Q. And the process and procedures that are to be followed and whatnot?

A. Yes.

Q. Would that experience in any way affect your ability or affect you or permit you from being impartial in this case in determining the issues?

A. No. I don't think that it would. If anything, it would probably enhance whether they've done right or done wrong. So --

4

Q. And when you were working drug cases, was -- what was -- let's say, when you retired, what was the primary substance that was being used at that time in the community?

A. Then, it was crack cocaine. And then -- I had bought fentanyl at one time, bought it out of a hospital from a patient actually, a fentanyl patch. But crack cocaine, cocaine, things like that. So that was -- and some marijuana. But most of it was pills and coke and crack.

Q. And in your employment status, you weren't involved in assisting people that were suffering from drug addiction or anything like that, did you?

A. No. No, I didn't.

. . . .

THE COURT: Are you completely satisfied that you can serve as a fair and impartial juror in the trial of this case?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: There is no doubt in your mind about that?

PROSPECTIVE JUROR: No doubt in my mind, Your Honor.

J.A. 522–25.

During a different part of voir dire, the court asked if any member of the venire or their immediate family members had "ever been involved with any conflict, controversy, or litigation with any department or agency of the United States," including "the United States Attorney's Office or any other agency of the government of the United States." J.A. 520. And all prospective jurors, including the Juror, answered, "No." J.A. 520.

After the jury was empaneled, Williamson's trial ensued. The jury found him guilty on all counts, and the district court sentenced him to 240 months in prison, followed by 6 years of supervised release. Williamson appealed.

5

While on appeal, Williamson's counsel discovered that the Juror did not disclose during voir dire that he was previously the target of a federal investigation into his role in a ring of corrupt political and law enforcement officials in Mingo County that investigators called "Team Mingo." J.A. 441–49, 944. Based on this information, Williamson moved in the district court for an indicative ruling on a motion for a new trial. We granted a limited remand for the purpose of permitting the district court to consider Williamson's motion.

**B.**

On remand, the district court ordered an evidentiary hearing to examine whether the Juror lied during voir dire and whether a new trial was necessary. The factual record that developed is nothing short of remarkable. As the old saying goes, "you can't make this stuff up."

Michael Thornsbury was once the sole circuit judge in Mingo County. He was also the center of Team Mingo. The Juror, as the Chief of Police for Williamson (a town in Mingo County, West Virginia) was also a member. Eugene Crum, the Mingo County Sheriff, was a member too. After taking office, Sheriff Crum appointed the Juror as the Mingo County Sheriff's Department's Chief Field Deputy—a position he served in while simultaneously continuing his work as the Williamson police chief.

It turns out Sheriff Crum owed an individual named George White $3,000 for political signs used in Crum's election campaign. Sheriff Crum didn't want to pay his debt. To avoid doing so, he took advantage of the fact that White was also a known drug dealer. Sheriff Crum arranged for a confidential informant to purchase three oxycodone pills from White. Based on this purchase, Sheriff Crum and the Juror secured a warrant to search

6

White's business, and the Juror appeared in front of a grand jury to assist in obtaining an indictment against White.

White did not take this lying down. After his indictment, White's attorney contacted the FBI and reported that Sheriff Crum had dirt on his hands. The lawyer arranged a meeting during which White told federal officials that he had previously sold narcotics to Sheriff Crum and that Sheriff Crum had also falsely reported various campaign expenditures. This led to an FBI investigation into Sheriff Crum for campaign finance violations, money laundering and controlled substance offenses.

Concerned about what might be uncovered by this FBI investigation, Judge Thornsbury conspired with other members of Team Mingo—including Sheriff Crum, a local prosecutor and a county commissioner—to prevent White from communicating any further with the FBI. To do this, they sought to separate White from his attorney. They went to White's brother and told him that Judge Thornsbury would give White a lighter sentence if he fired his lawyer and replaced him with a different lawyer approved by the judge. White complied and, right on cue, was given a more favorable sentence.

A month later, Sheriff Crum was shot and killed in a murder apparently unrelated to Team Mingo. The next day, the Mingo County Commission appointed his wife, Roseanna Crum, to succeed him as Sheriff. But the FBI continued to investigate the late Sheriff Crum's alleged crimes, and Judge Thornsbury remained concerned about the FBI investigation. He ensured that someone was always with Sheriff Roseanna Crum to prevent her from talking to investigators. But at some point, she turned a copy of her late husband's laptop hard drive over to the FBI, upsetting Judge Thornsbury.

7

The Juror also learned that Sheriff Roseanna Crum had cooperated with the FBI. In response, he approached her to express his displeasure with her for turning over the hard drive. And after learning that a sheriff's deputy was working with the FBI, the Juror suggested that the sheriff should assign the deputy to second shift in retaliation.

Eventually, a federal grand jury in the Southern District of West Virginia indicted Judge Thornsbury on federal corruption charges. And other members of Team Mingo were indicted too. But the Juror wasn't one of them. Ultimately, Judge Thornsbury and several other members of Team Mingo pled guilty and went to federal prison.

While the Juror was never indicted or arrested, he received a letter from the United States Attorney's Office for the Southern District of West Virginia informing him that he was the target of an investigation.[1] The Juror then spoke with his lawyer, who spoke with the U.S. Attorney's Office on his behalf. According to the Juror's testimony during the evidentiary hearing, the U.S. Attorney's Office told his lawyer that the office was not interested in the Juror. But, despite that testimony, the Juror, his lawyer and an Assistant United States Attorney signed a proffer agreement, which acknowledged that the Juror was "a subject of a federal investigation." J.A. 615. The proffer agreement was attached to notes

---

[1] In one place, the district court stated in its findings of fact that the letter indicated the Juror was "the *subject* of a federal investigation." J.A. 950 (emphasis added). However, the district court referred to the letter as a target letter in other places. The Juror referred to it as a target letter during his testimony in the evidentiary hearing. And an FBI note admitted as evidence during the evidentiary hearing referred to "[t]arget letters [being] served on [the Juror]." J.A. 614. Also, both parties say the Juror received a target letter from the U.S. Attorney's Office.

from an interview in which the FBI asked the Juror questions about his involvement with various schemes perpetrated by Team Mingo.

Soon after the indictment brought Team Mingo's corruption to light, Sheriff Roseanna Crum resigned, and James Smith was appointed as the new sheriff. One of his first acts in office was to fire the Juror from his position with the Mingo County Sheriff's office. Several months after Smith fired the Juror, the Juror returned some files on the George White matter that he had inexplicably taken with him when he left his employment with the Sheriff's Office and had kept in his garage since that time.

Civil litigation also ensued. Donald Ray Stevens and his wife, Ruby, sued several people involved in Team Mingo, including Judge Thornsbury and the Juror. Stevens was a private investigator. He and his wife alleged that, because he was serving papers in the neighborhood near where Judge Thornsbury lived, the judge mistakenly believed Stevens was investigating one of his extramarital affairs. To keep him quiet, Judge Thornsbury and others allegedly brought false charges against Stevens for attempting to possess an unlawful wiretap. The Stevenses accused the Juror of executing an unlawful search warrant and swearing out false allegations in a criminal complaint.

George White—the drug dealer and political sign maker—also sued the Juror and other members of Team Mingo stemming from the charges brought against him and the pressure exerted on him to change lawyers because of the debt Sheriff Eugene Crum owed him. And another individual sued the Juror, Judge Thornsbury and others, accusing the Team Mingo members of using false evidence to secure an indictment and coercing him

9

into pleading guilty on drug distribution charges. All three of these civil suits settled out of court.

## C.

After the evidentiary hearing, the district court made findings of fact and conclusions of law.[2] The factual findings included a determination that the Juror's answers during voir dire about his prior employment as Chief of the Williamson Police Department were truthful but misleading because he failed to mention his employment as Chief Field Deputy for the Mingo County Sheriff's Department. While the district court acknowledged that the Juror said he "worked with" the Sheriff's Department, the court determined that, by failing to mention his role there, "he shielded himself from any questions related to a most embarrassing period in his life." J.A. 958.

The district court also found that the Juror's answer of "No" to the question about whether he had been engaged in a controversy with the U.S. Attorney's Office was "not true." J.A. 958 (citation omitted). The court found "that a controversy did exist as a result of [the Juror] being named a target in a federal investigation in which the United States Attorney asserted in a target letter addressed to [the Juror] that 'an investigation has uncovered substantial evidence linking you to the commission of a federal crime.'" J.A. 958 (citation omitted).

---

[2] During the evidentiary hearing, the district court heard testimony from former Mingo County Sheriff James Smith and the Juror and admitted evidence on the investigation into the Juror and the criminal and civil cases against the various Team Mingo members. The above factual recitation is largely the district court's findings of fact based on that evidence.

The district court also considered why the Juror said he made this false statement.

It noted the following exchange between the Juror and defense counsel from the evidentiary

hearing:

> Q. I mean, if you're the subject of an investigation, a target of an investigation, I mean, wouldn't you be in conflict or controversy with the person trying to investigate you?
>
> A. At that time – that was 12 years ago – almost 12 years ago that that happened. And I'll be honest with you, I didn't think of it. I forgot about it. I just – I didn't remember it. Because, yes, I'd see – I can see where that would probably be important. But I just never thought about it. I gave honest answers at that time to what I thought was being asked.

J.A. 960 (citation omitted). Despite the Juror's insistence, the district court did not credit

this answer. It reasoned that the "turbulent events" would not be something the Juror would

forget. J.A. 960. So, it determined that:

> his answer was designed to avoid revelation of the tumultuous period in his life when in August 2013, he received the target letter and entered into the Proffer Agreement and the interview by two FBI agents and was promptly fired as Chief Field Deputy three weeks later by the newly appointed sheriff.

J.A. 959.

Still, the district court determined that the Juror was not biased. It credited the

following answer he gave during his evidentiary hearing when asked if he was biased in

favor of the prosecution:

> No. No. That -- I didn't wake up that day and think, well, you know what, I think I'm going to go to federal court and put somebody in jail. I didn't want to be here.
>
> I know it's my civic duty, and seeing how they taught me, I thought sure with me telling you or telling the Court me being a police officer and involved in drug work and task force and things like that, surely, I would not be picked.

11

I would not be picked. But they did. And I was stuck here. I didn't want to be here.

But I did my civic duty, and I did what I thought was right at that time.

J.A. 961–62 (citation omitted). And the district court credited the Juror's response when he was asked whether he was biased against the U.S. Attorney's Office: "No. I just – I was leery of them." J.A. 962 (citation omitted).

Based on these factual determinations, the district court declined to order a new trial. While the court acknowledged that it was "conceivable [the Juror] maintained some modicum of gratitude toward the government for declining to prosecute the case against him," the court also acknowledged that the opposite could just as easily be true—in other words, "[i]t [was] just as conceivable that [the Juror] maintained some modicum of disdain toward the government for its treatment of him regarding a situation in which he says he had done nothing wrong." J.A. 965. So, the court concluded that there was nothing in the record indicating actual bias and that the Juror's responses instead indicated, "if anything, indifference." J.A. 965. And the district court also explained that, largely for the same reasons, it would not have struck the Juror for cause even if he had been truthful during voir dire. Thus, the district court denied Williamson's motion. And Williamson amended his notice of appeal to include the denial of his request for a new trial.[3]

---

[3] We have jurisdiction over his appeal from the district court's final judgment under 28 U.S.C. § 1291.

12

## II.

With that sordid tale in mind, we identify our standard of review, which, as standards of review often do, plays a central role in this appeal. *See Portillo Flores v. Garland*, 3 F.4th 615, 649 n.11 (4th Cir. 2021) (Quattlebaum, J., dissenting) ("Like offensive linemen on a football team, standards of review lack glamour but are often decisively important."). We review a district court's denial of a motion for a new trial on the basis of a juror's failure to disclose information for abuse of discretion. *United States v. Fulks*, 454 F.3d 410, 430–31 (4th Cir. 2006). "A district court abuses its discretion 'when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law.'" *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (quoting *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007)). "In applying the abuse-of-discretion standard, we review the district court's factual conclusions for clear error . . . and its legal conclusions *de novo*." *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 250 (4th Cir. 2023). Under clear error review, we will "not reverse a lower court's finding of fact simply because we would have decided the case differently, but we may find clear error where the factual determinations are not supported by substantial evidence." *Id.* (quoting *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015)). And we owe "special deference" to the district court's determinations of both credibility and a juror's ability to be impartial. *Patton v. Yount*, 467 U.S. 1025, 1037 n.12, 1038 (1984) (citations omitted). In fact, the district court's "findings of impartiality might be overturned only for 'manifest error.'" *Id.* at 1031 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

13

## III.

Williamson claims the district court's denial of his request for a new trial based on the Juror's presence on the jury violated his Sixth Amendment right to a trial by an impartial jury. *See* U.S. Const. amend. VI. Such a claim comes in two forms: (1) actual bias and (2) so-called *McDonough* bias. *See United States v. Ritter*, 167 F.4th 677, 681 n.2 (4th Cir. 2026). Actual bias exists only when a juror cannot or will not decide the case solely on the evidence. *Porter v. White*, 23 F.4th 322, 327 (4th Cir. 2022). An actual bias claim does not depend on a juror's dishonesty during voir dire. *Id.* at 330. In contrast, a *McDonough* claim does—it requires a showing of a dishonest response by a juror during voir dire and that a truthful response would have revealed a valid basis to strike the juror for cause. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). The district court determined that there was neither actual bias nor *McDonough* bias. Williamson argues that both conclusions were wrong.

## A.

We start with actual bias. "Actual bias, or bias in fact, exists when a juror, because of his or her partiality or bias, [is] not capable and willing to decide the case solely on the evidence before [him or her]." *White*, 23 F.4th at 327 (alterations in original) (internal quotation marks omitted) (quoting *Porter v. Zook*, 898 F.3d 408, 423 (4th Cir. 2018)). In other words, "a juror is actually biased when he cannot be impartial." *Id.* When a district court determines that a potential juror cannot be impartial, the district court must exclude that juror as a matter of law. *United States v. Turner*, 389 F.3d 111, 117 (4th Cir. 2004). And "a showing that a juror was actually biased, regardless of whether the juror was

14

truthful or deceitful [during voir dire], can . . . entitle a defendant to a new trial." *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002). But, to reiterate, we must give "special deference" to a district court's determination on whether a juror can be impartial. *See Patton*, 467 U.S. at 1038 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984)).

Recall that the district court found that the Juror had no actual bias because it was not clear whether his prior experience with the U.S. Attorney's Office would suggest potential bias for or against the government. That experience, the court explained, could suggest the Juror would be sympathetic to the government because it did not indict him. But the court also noted that it could also cause the Juror to be mad at the government for targeting him in the first place. And the district court also credited the Juror's testimony that he was not biased against Williamson. For these reasons, the district court found no actual bias.

Williamson challenges this conclusion. He notes that the district court found that the Juror intentionally gave untruthful answers during voir dire "to avoid disclosing the most compromising period of his life." Op. Br. at 31. He also contends that lying in this way shows the Juror was not disinterested and could not be credible or neutral. And he contends "[t]his Court has held that the omission of material information during voir dire falls within the actual bias category known as intrinsic bias." Reply Br. at 7 (citing *White*, 23 F.4th at 327).

Beyond that, Williamson also argues that the conduct the Juror was accused of mirrors Williamson's defense theory at trial. At trial, Williamson alleged that the only

15

evidence of his drug transactions came from a confidential informant and a police officer who looked the other way when the confidential informant committed crimes and engaged in unethical behavior. Williamson also accused the officer of being untruthful in prior search warrant applications. From this, Williamson questioned the integrity of both the confidential informant and the officer, as well as the source of that evidence. Williamson now argues that the unethical police practices he accused the officer of perpetrating are similar to those the Juror was accused of engaging in.

In advancing these arguments, Williamson effectively argues that the omission of material information during voir dire is enough to establish actual bias. But that is not what our precedent says. In *White*, we upheld the district court's finding that there was *no* actual bias based on its determination that a juror *had not* intentionally lied or omitted information during his voir dire responses. 23 F.4th at 327–31. Notably, while we elaborated that "a juror's dishonesty during voir dire 'is *evidence* of bias,'" we did not hold that such dishonesty necessarily establishes actual bias—as Williamson seems to argue. *See id.* at 331 (emphasis added) (quoting *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006)); *accord McDonough*, 464 U.S. at 556–57 (Blackmun, J., concurring) ("Thus, regardless of whether a juror's answer is honest *or dishonest*, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." (emphasis added)).

So, we hold to the standard that we have previously applied—that the ultimate touchstone for assessing actual bias is whether a juror can be impartial. *See White*, 23 F.4th

16

at 327; *see also Jones*, 311 F.3d at 313 ("Misstatements on a jury questionnaire such as those here are troubling, but do not, standing alone, indicate juror bias."). This means that when a juror makes a misstatement during voir dire, the inquiry must focus on the juror's motivation for doing so and, importantly, whether that motivation implicates the juror's ability to be impartial.[4] *See Jones*, 311 F.3d at 313.

Applying the correct actual bias standard, the district court did not commit manifest error in determining that the Juror could be impartial. *See Patton*, 467 U.S. at 1031–32; *see also White*, 23 F.4th at 327. Indeed, even if Williamson's defense theory closely mirrored the facts of the investigation into the Juror, that does not mean the Juror necessarily had an actual bias against Williamson. Notably, the district court found that there was no evidence of the Juror's actual bias one way or the other. And there was evidence in the record to support that conclusion. Primarily, when asked during the evidentiary hearing whether he was biased in favor of the government and whether he was biased against the government, the Juror answered "No" to each question. J.A. 676, 682, 961–62 (citations omitted). And the district court reached its determination that the Juror was impartial largely because it credited his responses to both of these questions.

---

[4] In fact, automatically concluding that any juror who is dishonest during voir dire harbors actual bias would not make sense considering the rest of the *McDonough* standard. As we discuss in more detail below, a defendant wishing to press a *McDonough* challenge must show both that (1) the juror was dishonest during voir dire and (2) that a correct response would have provided a valid basis for a challenge for cause. 464 U.S. at 556. But if dishonesty during voir dire were all that was needed to show actual bias and thus satisfy the second prong of the inquiry, there would be no reason for the first prong. Thus, the district court was not required to find actual bias simply because the Juror lied.

Perhaps there is evidence from which the district court could have reached a different conclusion. But that doesn't matter. Referring back to our standard of review, we must give "special deference" to the district court's determinations of both credibility and impartiality. *See Patton*, 467 U.S. at 1037 n.12, 1038. Doing so, we cannot say the district court committed "manifest error" in reaching conclusions that it did. *See id.* at 1031–32. Thus, under our standard of review, we affirm. *See id.*; *White*, 23 F.4th at 330 ("While we may have made a different decision in the face of the testimony of a police officer versus Juror Treakle, we must defer to the district court's credibility determination.").

**B.**

Next, we consider Williamson's argument about *McDonough* bias. "To succeed on a *McDonough* claim, a litigant must demonstrate that (1) 'a juror failed to answer honestly a material question on *voir dire*' and (2) 'a correct response would have provided a valid basis for a challenge for cause.'" *White*, 23 F.4th at 331 (quoting *McDonough*, 464 U.S. at 556). We have also read a third requirement into this inquiry—"a juror's bias is only established under *McDonough* if the juror's motives for concealing information or the reasons that affect [the] juror's impartiality can truly be said to affect the fairness of [the] trial." *Id.* (internal quotation marks omitted) (quoting *Conaway*, 453 F.3d at 588).[5] The upshot of this is that in our Circuit, we have a three-part *McDonough* test.

---

[5] We have previously recognized that this effectively makes the *McDonough* test a three-part inquiry but have also said we "adhere to the uniform practice of referring to the *McDonough* test as having two parts." *Conaway*, 453 F.3d at 585 n.20. That seems illogical, so we should stop.

**1.**

As for the first prong, the district court found that the Juror failed to answer honestly during voir dire. Neither party challenges this finding. Therefore, we move to prong two.

**2.**

As for the second prong, we must determine whether "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. A "*McDonough* claim necessarily fails [at the second prong] unless the [district] court would have committed reversible error—that is, abused its discretion—in failing to dismiss [the disputed juror] for cause." *Fulks*, 454 F.3d at 432. The district court directly stated that it would not have excluded the Juror if it had known the truth of everything he withheld during voir dire. So, our inquiry is whether it would have been an abuse of discretion to not exclude the Juror.

A district court's decision to not strike a juror for cause may only be an abuse of discretion in two circumstances—if there (1) is actual bias or (2) a per se rule of disqualification. *Fulks*, 454 F.3d at 432 (citing *Turner*, 389 F.3d at 115). As discussed above, the district court's finding of no actual bias was not an abuse of discretion. Therefore, Williamson must show that the Juror should have been disqualified under a per se rule.[6]

---

[6] As already explained, a defendant can assert a stand-alone actual bias challenge to his conviction outside of the *McDonough* framework. So, though a defendant can demonstrate the second prong of a *McDonough* claim by showing either actual bias or a per se rule of disqualification, *see Fulks*, 454 F.3d at 432, it would be odd for the second prong to turn on actual bias. That's because, if there is actual bias, the defendant can assert that as a stand-alone challenge to his conviction without having to show the other

19

The number of such per se rules is limited, as they take away from the discretion generally afforded to district court judges in determining whether a potential juror could serve impartially. *Turner*, 389 F.3d at 115. And "[t]he burden on any litigant seeking to disturb our settled practice of rejecting per se challenges is a heavy one." *Id.* at 116. Thus, in the absence of actual bias, challenges for cause are typically limited to rare situations when a juror's bias is implied. *See id.* at 117. And this strong connection between the juror and the case warrants automatic disqualification regardless of the juror's answers during voir dire and regardless of the existence or absence of actual bias. *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997). Thus, implied bias is a per se rule of disqualification, meaning a district court's failure to strike a juror with implied bias is an abuse of discretion. *See id.*; *Zook*, 898 F.3d at 443 (Shedd, J., concurring in part and dissenting in part). So, we turn to that now.

"[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Turner*, 389 F.3d at 117 (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)). "Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the

---

*McDonough* prongs. *See Zook*, 803 F.3d at 698 ("[W]hile a *McDonough* claim requires a showing of juror misconduct, an actual bias claim may succeed 'regardless of whether the juror was truthful or deceitful.'" (quoting *Jones*, 311 F.3d at 310)). Practically, therefore, the second prong of the *McDonough* analysis will often be limited to a determination of whether there is a per se rule of disqualification in cases like this one.

20

participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). Thus, implied bias typically arises when the juror is directly related to the parties or to the crime itself. *See id.*

The district court determined that "[t]he instant case is far removed from" the categories of implied bias recognized by Justice O'Connor in *Smith*. J.A. 969 (citing *Smith*, 455 U.S. at 222 (O'Connor, J., concurring)). Williamson seems to take issue with this conclusion, but it is not clear why. In his opening brief, he states in a single paragraph that the district court erred in "concluding only that this case was 'far removed' from the strict implied bias categories." [7] Op. Br. at 28 (citing J.A. 970).

The closest Williamson comes to arguing an implied bias theory is when he contends that the Juror's conduct was similar to the conduct that resulted in a juror getting disqualified in *Brooks v. Dretke*, 444 F.3d 328 (5th Cir. 2006).[8] But the juror at issue in that case was actively being investigated for other crimes by the prosecutor while he was serving as a juror in a case being prosecuted by that same attorney. *Id.* at 332. And the Fifth Circuit determined that the pending investigation gave the prosecutor an improper amount

---

[7] Williamson also states elsewhere that the Juror should have been excluded "under any standard of bias—actual, implied, or inferred," but he does not expound on this point. Op. Br. at 20. And, in his reply brief, he has a section captioned as "Implied/Inferred Bias," but his argument in that section focuses exclusively on inferred bias. *See* Reply Br. at 5–6. To the extent these are arguments, these points seem to be more focused on inferred bias—which is different from either actual bias or implied bias and which we will discuss in more detail below.

[8] Williamson makes this argument in the context of inferred bias, but it seems to be more closely related to an implied bias theory.

of leverage over the juror. *See id.* That situation is distinguishable from this case because, here, the Juror's involvement with the U.S. Attorney's Office had happened years earlier, and Williamson concedes that any new federal charges against the Juror would be time barred.

In any event, the Juror was not as closely connected with either of the parties or Williamson's crimes as in the examples Justice O'Connor provided in *Smith*. *See* 455 U.S. at 222 (O'Connor, J., concurring). Thus, the Juror's prior connection with the U.S. Attorney's Office does not rise to the level of implied bias.

### 3.

In addition to his arguments on actual bias and implied bias, Williamson also contends that the Juror suffered from a third category of bias called inferred bias. He argues that the Juror's inferred bias entitles him to relief under *McDonough*. Though he is not clear on how his inferred bias theory fits into the *McDonough* framework, it would only entitle him to relief under that framework if inferred bias is a per se rule of disqualification.

We have never explicitly stated that a district court can dismiss a juror for cause based on inferred bias. But in *Jones*, we raised that possibility based on the Second Circuit's decision in *Torres*. *See Jones*, 311 F.3d at 312 (citing *Torres*, 128 F.3d at 43). In *Torres*, the Second Circuit described inferred bias as possibly existing even when there is no actual bias or implied bias:

> Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias. There is no *actual* bias because there is no finding of partiality based upon either the juror's own admission or the judge's

22

> evaluation of the juror's demeanor and credibility following voir dire questioning as to bias. And there is no *implied* bias because the disclosed fact does not establish the kind of relationship between the juror and the parties or issues in the case that mandates the juror's excusal for cause.

*Torres*, 128 F.3d at 47.

Here, the district court acknowledged *Torres*' inferred bias theory but found that "any 'risk of partiality' would not have been 'sufficiently significant to warrant' [the Juror's] excuse for cause." J.A. 968 n.2. Williamson resists this conclusion. He argues that courts have found inferred bias when the facts of a juror's background closely resemble the facts of the case, and he maintains that the facts the Juror concealed are similar to his theory at trial. Williamson then accuses the Juror of concealing his past for the express purpose of remaining on the jury. He also posits that the Juror may have lied out of fear of facing fresh criminal charges in state court. And finally, Williamson contends that the Juror's presentation of himself as an honest police officer might have given him greater influence on the jury.

The problem for Williamson is that, in *Torres*, the Second Circuit expressly stated that striking a juror for inferred bias is always at the district court's discretion. *See* 128 F.3d at 47 ("Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant *granting the trial judge discretion* to excuse the juror for cause, *but not so great as to make mandatory a presumption of bias*." (emphasis added)). Following that reasoning, even if we were to recognize the theory of inferred bias, a finding of inferred bias would not require a district court to strike a juror. Thus, inferred bias would not amount to a per se rule of disqualification. *See id.* And this is bolstered by our previous

23

admonition that "appellate courts are loath to announce such per se rules." *Turner*, 389 F.3d at 115.

As a result, there is no basis for finding that the district court would have abused its discretion in failing to strike the Juror for cause. *See Fulks*, 454 F.3d at 432. So, Williamson's *McDonough* claim fails at the second prong. *See id.*

**IV.**

In sum, the Juror may have been dishonest during voir dire. And his role in the affairs of Team Mingo is indeed disturbing. But under our standard of review, we defer to the district court's determination that the Juror was impartial, and the district court would not have abused its discretion by failing to strike him for cause if he had been honest. Thus, the district court did not abuse its discretion in denying Williamson's request a new trial. The judgement of the district court is, therefore,

*AFFIRMED.*

24